## CITY OF DETROIT v. GRUMMOND.

(Circuit Court of Appeals, Sixth Circuit. March 19, 1903.)

No. 1,135.

1. REVIEW ON ERROR—QUESTIONS NOT MADE IN TRIAL COURT—WAIVER.
   The failure of a defendant to file an affidavit denying the execution of the contract sued on, as required by a rule of the courts of Michigan and of the Circuit Court of the United States in that state, to put plaintiff upon his proof, cannot be urged in the appellate court to exclude consideration of the question of the due execution of the contract, where the objection was not made in the trial court, which, under the construction placed upon the rule by the courts of the state, might have permitted the filing of the affidavit at any time before the close of the trial.

2. MUNICIPAL CORPORATIONS—CONTRACTS—EVIDENCE OF RATIFICATION.
   Where a city was sought to be held on a written contract for the hiring of a vessel to be used for hospital purposes, purporting to have been made on its behalf, but which was not authorized by anything appearing on its records, on the ground that the contract had been ratified by the acceptance and use of the vessel and the payment of the rental therefor, but the delivery of the vessel and payment of rental took place prior to the execution of the contract, evidence was admissible to show the previous passage of a resolution by the board of health, acting under authority given by the city council, accepting a proposition made by one of its members for the hiring of a vessel then owned by him, but subsequently transferred to plaintiff (the contract made by such resolution being void under the city charter), it being a question for the jury whether the alleged acts of ratification had reference to the contract with plaintiff sued on, or to the prior void contract.

3. ERROR—REVIEW—FACTS APPEARING FROM BILL OF EXCEPTIONS.
   When the evidence shown by a bill of exceptions points distinctly to a definite result, although the bill does not purport to contain all the evidence, if the defendant in error purposes to deny the inference to be drawn from it he should see that enough is stated at least to show that there was other evidence on the point which might affect the conclusion.

4. CONTRACT FOR PROCURING INSURANCE—CONSTRUCTION.
   Under a contract by which the hirer of a vessel agreed to "pay the insurance" thereon for a certain sum, the duty of procuring the insurance devolved upon the owner, who would then have recourse upon the hirer for the amount of the premium.

**5. INSURANCE — CONTRACT INSURING MOORED VESSEL AGAINST FIRE—LAW GOVERNING.**

A contract for the insurance against fire of a vessel while lying moored and in use as a hospital is not maritime, and the measure of liability for a loss by fire which partially destroyed the vessel is not governed by the rules of marine insurance, but by those of fire.insurance, and is limited to the amount which the value of the property was depreciated by the fire, not exceeding the sum 'insured for. The entire sum would not be recoverable merely because it would cost more to repair the vessel than she would be worth when repaired.

**6. CONTRACT FOR HIRING OF VESSEL—CONSTRUCTION.**

Under a provision of a contract for the hiring of a vessel to be moored and used for a hospital, binding the city, which was the hirer, to pay a stipulated sum as the value of the vessel in case she should be "lost or destroyed" by the fault of the hirer, the city did not become bound to pay for the vessel because of a damage by fire through the negligence of its servants, not amounting to a total loss or destruction of the vessel.

**7. SAME.**

A stipulation, in a contract for the hiring of a vessel for a specified time, binding the hirer to return her in as good condition as when taken, reasonable use, wear, and tear excepted, does not entitle the owner to refuse to accept the vessel when tendered back, and to recover her value, because of a breach of such stipulation, but only to recover the damages arising from the breach.

In Error to the Circuit Court of the United States for the Eastern District of Michigan.

This is a suit brought by the defendant in error against the city of Detroit upon a contract alleged to have been made between the parties November 30, 1892, for the hiring by the city of the steamboat Milton D. Ward of the plaintiff in the suit for the term of two years from the 14th day of September, 1892, for the purpose of being used by the city as a hospital in which persons suspected of bringing germs of cholera from abroad could be isolated and cared for.

It appears from the record that on August 30, 1892, the health officer of the city, apprehending an epidemic of cholera, presented to the common council a communication upon that subject, wherein he referred to the danger from immigrants, and said that he found "that the only hope of keeping the city is in having a quarantine hospital built on a scow which we can keep in the stream." This was "referred to the committee on ways and means and health and the city counsellor." On September 2d, the committee having reported and recommended prompt action, the common council passed the following resolution: "Resolved, that the board of health and health officer be and are hereby empowered and directed to adopt such measures and plans as, in their judgment, are wise and expedient to prevent the introduction and spread of cholera into the city, and that any and all expenses necessary to carry into effect such plans and regulations as they may adopt is hereby authorized." On September 13th the health officer reported to the common council the steps which had been taken by him and the board of health at special sessions held on September 6th, 7th, and 8th,.in which he said, among other things, that, although scows had been offered, it would take time to fit them up, and they lacked a steam boiler, and that the committee turned their attention to some boats; and he further stated that "at another special meeting held in the mayor's office, Controller Black stated that a boat could be procured for $5,000 for two years, the board to pay insurance on $12,000. The party selling the boat would caulk her up and put her in shape. In case the city wished to buy the boat, $7,000, without the engine, was the price. That Controller Black moved the proposition be accepted, which was seconded and carried. The board passed a resolution that the controller and health officer be a committee to look after the expenditures," etc. This report was referred to the committee on ways and means, who reported that, as the common council had granted full power to meet all

emergencies to the board of health, the committee did not see that any further action was necessary, which report was adopted by the common council.

While these proceedings were taking place, Stephen B. Grummond was the owner of the steamer Milton D. Ward, and he was a member of the board of health, participating in its proceedings. On the 14th of September, 1892, he gave a bill of sale of the steamer to U. Grant Grummond, his son, who is the plaintiff in this action. The record does not clearly show at what time possession of the steamer was given to the city, but apparently it was as early as the 14th of September, 1892.

On the trial the defendant in the court below read in evidence from the record of the board of health the following entry: "Mayor's Office, September 8, 1892, at 2 o'clock p. m. Adjourned meeting. The board of health met pursuant to adjournment in the mayor's office. Present: His honor, the mayor, Controller Black, President of the Police Commission Grummond, Dr. C. C. Miller, Dr. Duncan McLeod, Dr. Jos. Schulte. President Miller in the chair. Controller gave as his figures on the boat $5,000. Capt. Grummond will caulk her and put her in shape and rent her to the board for two years, the board to pay the insurance on $12,000, and, in case the city buys the boat, $7,000, without the engine. Controller Black moved that this proposition be accepted. Seconded and carried. President Miller asked how the transfer was to be made. It was stated this should be made to the controller. Capt. Grummond said he would fit up stoves, and said also that the best place to anchor would be in the neighborhood of Zug Island. It was resolved that the controller and the health officer be a committee to look after the expenditures, etc. On motion, the board adjourned. Samuel P. Duffield, Secretary." Counsel for the plaintiff objected that this was incompetent evidence, and moved that it be stricken out. Counsel for defendant, in answer to a question from the court in regard to its competency, said: "It is part of the history of this transaction by which the board of health got possession of this boat, and it is important in this way: That the first record we have of any dealings with the boat, which will identify it as this boat, was on the 8th day of September, 1892, at the time when Capt. Grummond was a member of the board of health of the city of Detroit, and at the time when Capt. Stephen B. Grummond was the owner of the Milton D. Ward. The only contract or arrangement that was ever made. as we expect to show, between the board of health and Capt. Grummond, or by authority of the board of health and Capt. Grummond, or any one else, was contained in this record." The court excluded the entry, and counsel for defendant excepted.

On the 22d of November, 1892, the common council approved and allowed the following account: "U. Grant Grummond, rent for steamer Milton D. Ward, two years from Sept. 14, 1892, $5,000.00."

On the 30th of November, 1892, the contract upon which this suit is founded was executed, as follows:

"It is hereby agreed between U. Grant Grummond, of the city of Detroit, Michigan, of the first part, and the city of Detroit, of the second part, as follows:

"The said party of the first part, in consideration of the sum of five thousand dollars ($5,000) to him in hand paid, the receipt of which is hereby acknowledged, and of the agreements hereinafter contained, doth hereby let and charter to the said party of the second part the sidewheel steamer Milton D. Ward, for the term of two (2) years from and after the fourteenth day of September, A. D. 1892, to be used by said party of the second part as a hospital ship, hereby covenanting with the said party of the second part, and that at the time of the delivery of these presents he is the sole and true owner of said steamer, and that she is staunch, seaworthy and fit for use as a hospital ship and for navigation upon the rivers.

"And the said party of the second part hereby hiring and chartering the said steamer for the term of two years aforesaid, doth covenant and agree that it will at its own expense keep said steamer insured to the satisfaction of the party of the first part in the sum of twelve thousand dollars ($12,000) against any loss by fire, and against any loss from any marine risks, at such

times as said vessel may be exposed to danger from any such risks, and at the end of said term will return the said boat to the said party of the first part, his representatives and assigns at the port of Detroit, in like good condition as when taken, reasonable use, wear and tear excepted.

"Said insurance to be for the benefit of the said party of the first part and the payment of the insurance in case of loss shall be taken in lieu of return of the vessel, provided that if said vessel be lost or destroyed by reason of any peril, risks or cause not insured against and by the fault of the said party of the second part, said party of the second part shall pay to the said party of the first part the sum of twelve thousand dollars ($12,000) as the value of said vessel.

"It is hereby mutually agreed that the said second party shall have the right to purchase said steamer at any time within the said two years, for the sum of seven thousand dollars ($7,000), but if such sale be made, the party of the first part shall have the right of removing the engine of said steamer.

"In witness whereof, the said party of the first part hereto sets its hand and seal and the said second party hereunto sets its corporate seal and causes these presents to be subscribed in its behalf by the president of the board of health and the health officer, this 30th day of November, 1892.

　　　　　　　　　　　　　　　　　　　　"U. Grant Grummond. [Seal.]
"[Seal.]　　　　　　　　　　　　　　　The City of Detroit,
　　　　　　　"By C. C. Miller, President of the Board of Health.
　　　　　　　　　　　　　　　　　　　"Samuel P. Duffield, M. D.,
"Attest:　　　　　　　　　　　　　　　　　Health Officer.
　　"John R. Schmid, Deputy City Clerk."

The city clerk testified that the records of the common council did not show that a contract of that kind was at any time submitted to the common council. The secretary of the board of health testified that there was no entry in the records of the board concerning any contract between U. Grant Grummond and the city in relation to the steamer.

The defendant called as a witness Dr. Jos. Schulte, who testified that he was a member of the board of health on September 8, 1892, and afterwards through that year. Counsel for defendant asked this question: "While you were a member of the board of health in the year 1892, did your board authorize the making of any contract with U. Grant Grummond concerning the steamer Milton D. Ward, either on behalf of the board of health or of the city of Detroit?" The question was objected to, but no ground for the objection was stated. The court, however, sustained the objection, and counsel for defendant excepted. There being no statement of the answer expected, we cannot review this ruling. There was testimony showing that the boat was never used as a hospital, but was kept by the city, moored near an island in the Detroit river, the caretaker being paid by the city on bills rendered from time to time during the time the city had possession.

On August 15, 1894, the boat took fire (from the carelessness of the men employed to put up a stove in her), and was somewhat damaged thereby. In respect to the extent of the damage the witnesses were widely apart; some saying the vessel became a total wreck thereby, and others that the damage was slight either to the boat or her machinery. The boat was an old one, built about 1870, of a sidewheel pattern.

On September 14, 1894, U. Grant Grummond demanded of the city that it either return the boat to him in as good condition as when taken, reasonable wear and tear excepted, or pay him the sum of $12,000. The city tendered back the boat to him as it was, but refused to pay the $12,000 demanded. Grummond refused to accept the boat, and brought suit. The declaration contains three counts, all declaring upon the special contract of November 30, 1892, and claiming to recover $12,000 damages. The plea, as amended, consisted of the general issue and a notice added, pursuant to a statute of the state, authorizing it, stating that the defendant would prove thereunder that during the time while the negotiations for the boat were pending she belonged to Stephen B. Grummond; that he was a member of the board of health at the time when the proposition to let her to the board of health was made to the board and when the proposition was accepted by it, and par-

ticipated in its proceedings; and thereupon, after referring to certain provisions of the charter of the city forbidding, under penalties, its officials from making contracts with the city in which they should be interested, averred that the contract for the hiring of the vessel was made with Stephen B. Grummond, and not with U. Grant Grummond, and was contrary to public policy, and void.

The case was tried by the court and a jury, and the result was a verdict and judgment for $16,366.66, being the amount of $12,000 and interest.

Certain rulings of the court on the trial respecting the admission of testimony and in the instructions to the jury are assigned as errors, and are noted in the opinion which follows.

Timothy E. Tarsney, for plaintiff in error.

F. H. & G. L. Canfield, for defendant in error.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

SEVERENS, Circuit Judge, having made the foregoing statement of the case, delivered the opinion of the court.

A question in its nature preliminary should first receive attention. It is contended for the defendant in error that by the failure of the city to file an affidavit denying the execution of the contract set out in the declaration it admits the execution and the authority of those signing it in behalf of the city, and reference is made to rule 28 of the court in which the trial was had, and which is also a rule of the circuit courts of the state, by which it is provided that, "upon the plea of the general issue in an action upon any written instrument, under seal or without seal, the plaintiff shall not be put to the proof of the execution of the instrument or the handwriting of the defendant, unless the defendant, or some one in his behalf, shall file and serve a copy of an affidavit denying the same." This rule has been given a broad construction by the Supreme Court of the state, and has been held to require an affidavit when the contract in suit purports to be executed in behalf of the defendant by attorney, if the defendant proposes to deny that the instrument was duly executed as its contract. Peoria Ins. Co. v. Perkins, 16 Mich. 384; Inglish v. Ayer, 92 Mich. 370, 52 N. W. 639. And, notwithstanding such a construction may not be due in all circumstances, we were, upon the argument, much impressed by this objection to that part of the defense upon which the plaintiff in error relies. But upon more careful examination of the record we do not find that this objection was made in the court below, and it is quite clear that the trial proceeded without regard to the rule, as if the question of authority was an open one; and the case was submitted to the jury upon the assumption that the contract derived its validity from the ratification of the city. In these circumstances we ought to deal with the case in accordance with the position taken by the parties and the action of the court upon the trial. The course pursued amounted to a waiver by the plaintiff of the affidavit required by the rule. If the plaintiff or the court had stood upon the rule, it would have been competent for the defendant to have then applied for leave to file an affidavit, and the court might have granted it; for it is held by the state Supreme Court that the affidavit may be filed at any time before the trial is ended. In Freeman v. Ellison, 37 Mich. 459, the Supreme Court, Judge Campbell delivering the opinion, reversing the

judgment in a case where the defendant had neglected to file an affi-davit denying the execution of the contract in suit, said:

"We take occasion to repeat what we have said before, that there is no reason whatever why a circuit court should not allow an affidavit to be filed at any stage of the case, and that such leave ought not to be declined where it will work manifest injustice to decline it."

It is apparent from the record that it was material to ascertain whether the hiring of the steamer in behalf of the city was by the contract with U. Grant Grummond of November 30th, or was by a contract with Stephen B. Grummond, made previous to the bill of sale of September 14th, and with respect to which U. Grant Grummond, in consequence of the transfer, succeeded his father as lessor. It was material in more ways than one. First, because, if the latter was the fact, Stephen B. Grummond being a member of the board of health, it vitiated the contract of hiring—a consequence which would fol-low the transaction into the hands of the transferee, and no recovery could be had upon it in any condition of the pleadings which the court might permit (Dillon on Municipal Corp. § 444); and, secondly, be-cause, as the sequel shows, the case was put to the jury as one in which the plaintiff was entitled to recover upon the ground that the contract of hiring, although not shown to have been originally author-ized either by the common council or the board of health, had yet been ratified by the city by taking and keeping the possession of the vessel during the two years, and paying the $5,000 "in hand paid." In order to show the intention and the effect of the supposed ratifica-tion, it was necessary to understand to what the action of the city was referable. There was nothing in its records, either of the common council or of the board of health, to show that the city had a contract with U. Grant Grummond. On the other hand, it was known to the city that the health officer, who was one of those charged with the execution of the authority given by the common council, had reported a proposition which had been made to the board of health for the let-ting of the steamer, and its acceptance by the board, before the 14th of September. It also knew that, contemporaneously with that trans-action, possession of the steamer had been delivered to the city. There was a record in the office of the board of health, of which the city might be charged with notice, especially as the common council committed full power and authority to act in the matter, and which showed that on the 8th of September the board of health had hired the steamer upon terms there stated. It was the only record of the city offices expressly showing that any contract had been made for the steamer. This was read in evidence, but subsequently excluded by the court, as already stated. We think this was error. It is not ad-visable that we should express any opinion upon the weight of the facts recited as evidence, but we are constrained to say that they had a direct bearing upon the subject of the ratification, by which the court held the city bound; and none of the matter referred to seems to us more persuasive than that which was excluded. While upon this subject, we will refer to the payment of the $5,000 by the city on November 22, 1892, upon which much reliance is placed as showing a ratification. Certainly, it is impossible to say that as matter of law it had any such

consequence. To begin with, it was made eight days before the contract of November 30th. There is nothing to show that there had been any negotiations with U. Grant Grummond prior to the date of this last contract. The only contract in evidence when the payment was made, so far as appears, was the one made with Stephen B. Grummond. Whether U. Grant Grummond had made known to the city the transfer to him does not appear; but from the fact that no contract had been made with him, it is probable that he had made known the transfer. At all events, there is room for saying that the payment of the $5,000 was quite as easily referable to the contract which the city knew had been made as to one which did not exist, and of which it had no contemplation; and it was a question for the jury to determine what inference should be drawn from the circumstances in respect to the question what contract the common council intended to ratify by the payment. Another thing which the jury might regard was the improbability that the steamer should have been delivered to the city, and devoted to its use for more than two months, without any contract between the owner and the city. Similar considerations apply to the facts that the city continued to possess the boat, and paid for taking care of it. It was at least an open question of fact to what contract such action referred. But it is urged by counsel for defendant in error that the entry in the records of the board of health was incompetent to contradict or impeach the contract sued upon, because it only showed negotiations with Stephen B. Grummond, or possibly another contract with him. But neither of the parties contended or admitted at the trial that there was more than one contract for the hiring of the boat, and there is no room for any such contention now. The question upon this branch of the case was, what was the agreement upon which the parties acted, or, more precisely, which the city acted upon in its supposed ratification?

A similar question was presented to us in the recent case of Stoll v. Loving, 120 Fed. 805, where we were compelled to reverse the judgment of the Circuit Court, for the reason that the court had refused to submit to the jury the question as to which of two possible contracts the plaintiff had for performing the services for which he sought to recover.

It is further urged that the entry does not amount to an agreement with Stephen B. Grummond. But we think that it is evidence tending to show that such an agreement as is therein stated was made; and that, followed up as it was almost immediately by delivery of the vessel to the city, the jury might have found, if they were satisfied of the fact, that an agreement for the hiring of the boat was made in behalf of the city with Stephen B. Grummond. Again, it is said that it does not appear what boat was referred to, or what were the terms of the contract. But the earmarks are amply sufficient to show prima facie, at least, the identity of the vessel referred to with the vessel which was employed. The similarity of the terms of the contract with those of the contract of November 30th, though they are not identical, tends to show that they related to the same subject. Nothing appears to suggest an inference that some other vessel was intended. It is pointed out, however, that the bill of exceptions does not purport to con-

tain all the evidence, which is true. But when that which is shown by the bill points distinctly to a definite result, the defendant in error should see to it that enough is stated to show that the conclusion from what does appear is not the necessary one, if he proposes to rebut or deny the inference which should be drawn from it. It should at least be made to appear that there was other evi· ;nce upon that point which might affect the conclusion.

In the instructions to the jury, the court, waiving all question as to whether the contract in suit was authorized in its execution by either the common council or the board of health, put the case to them upon the assumption that, although it might not have been so authorized, it had been distinctly ratified by the city, and was thereby made valid. The only question left to the jury was with reference to the measure of damages. The general proposition of law involved that a municipality may, by ratification, make valid a contract made in its behalf by an unauthorized agent, which the municipality had authority to make, may be conceded. For the reasons we have stated, we think it was a question of fact whether the city had ratified the contract on which the suit was founded, and that the error of the court was in excluding material testimony bearing upon that question.

Other rulings relating to the admission of evidence touching that subject are assigned as error, but, as the judgment must be reversed, and they may not be again presented, we do not pass upon them.

Another matter is this: No insurance was effected upon the vessel, and under the ruling of the court as given to the jury the only question of fact submitted was upon the measure of damages. There was a difference between the contract sued on and the contract represented by the health officer to the common council to have been made and in the excluded record of the board of health in respect to the matter of insurance. By the former the city was to effect the insurance in the sum of $12,000. By the latter it was to pay the insurance, a stipulation which would devolve taking the initiative step upon the owner, who would effect the insurance, and have recourse to the city for the premium. The plaintiff was permitted, under the charge of the court, to recover the whole amount of the contemplated insurance, upon the ground that by neglecting to insure the vessel the city became insurer in that sum—a result which could not have been permissible unless the contract of November 30th had become the contract of the city. It is suggested by counsel for defendant in error that the stipulations in the respective agreements, if there were two, were of the same legal effect; and the case of The Barnstable, 36 C. C. A. 199, 94 Fed. 213, is cited to sustain that proposition. The case cited was one where the owner of the vessel stipulated with the charterer to pay insurance upon the vessel. The ship became liable for the consequences of a collision, and the owner sought to establish the ultimate liability against the charterer. The owner had not effected insurance, and it was held that he could not prevail, for the reason that the risk contemplated by the stipulation was a risk of his own property, and the stipulation must, therefore, be interpreted as meaning an insurance which he would attend to; and, having failed to do what would have protected him against loss, he could not fix the liability on the

charterer. Here the situation is reversed, and, if the construction be doubtful, the case cited would tend to support the presumption that the owner would be expected to attend to his own insurance.

The court, in charging the jury upon the subject of damages, after referring to the testimony in respect to the condition of the vessel after the fire, told them that, while she was not physically consumed, she was, as claimed by the plaintiff, practically destroyed; that "the result would entitle the plaintiff to a recovery of the insured [insurer?] of that amount if you find that testimony is true, and you approve it, namely, that the damage to the vessel was to such an extent that it would cost more to repair her than she would be worth when repaired. If you think that was the extent and amount of the damage, then you would be entitled to give the plaintiff damages for the stipulated sum here of twelve thousand dollars, and interest from the 1st of October, 1894." We think this was erroneous and misleading. Apparently the learned judge had in mind a rule of marine insurance applicable in cases of abandonment. But some of the rules of marine insurance are founded on reasons not applicable to ordinary insurance, and we doubt whether the rule stated would be applied in marine insurance to circumstances such as these. But this contract was not maritime. It did not relate to navigation, but only to a vessel which was to lie moored in the Detroit river for two years as a hospital. 19 Am. & Eng. Encycl. of Law, 940; Insurance Co. v. Dunham, 11 Wall. 1, 20 L. Ed. 90; The Richard Winslow, 18 C. C. A. 344, 71 Fed. 426; The Pulaski (D. C.) 33 Fed. 383. It is, therefore, to be construed and given effect, so far as it may be, by the rules of the common law. It involved insurance against loss by fire. Insurance against "marine risks" was also included. To what extent insurance against marine risks other than fire, on such a subject, was possible, we need not inquire. The vessel was undoubtedly the subject of insurance against loss by fire. If we assume that the city, by its failure to insure, was put in the place of an insurer against fire, then we are to inquire what would have been the measure of the recovery in a suit brought by the owner against an insurer on such a loss. It must be answered that it would have the extent to which the value of the property had been depreciated by the fire, not exceeding the sum mentioned in the policy. The sum mentioned in the policy would serve only as the limit of the recovery. The vessel was an old one. It might be bad policy to spend much money in repairing her. Quite possibly it would be more profitable to dismantle her, or cast her away, than to repair her at all. She might not have been worth $12,000 before the fire, or after it, if she had been repaired. To tell the jury that, if they thought she would not be worth the cost of repairs when repaired, they "would be entitled to give the plaintiff damages for the stipulated sum of twelve thousand dollars and interest," was a dangerous suggestion to come to a conclusion not warranted by the premises. The "stipulated sum" was not stipulated for any purpose here, but only stood as the limit of recovery in case of insurance.

Our attention is called by the brief for the defendant in error to that clause in the contract upon which the suit is brought, which reads as follows:

"Said insurance to be for the benefit of the said party of the first part and the payment of the insurance in case of loss shall be taken in lieu of return of the vessel, provided that if said vessel be lost or destroyed by reason of any peril, risks or cause not insured against and by the fault of the said party of the second part, said party of the second part shall pay to the said party of the first part the sum of twelve thousand dollars ($12,000) as the value of said vessel."

And it is claimed that by this the city, in case the vessel was lost or destroyed in the circumstances stated, was bound to pay the sum of $12,000. It is manifest, however, that a total loss or destruction was intended; for it cannot be supposed that if some partial loss should happen, and the damages recovered from the insurer for that should be paid to the owner, the parties intended that the title to the vessel should pass to the city. And the instruction of the court which we are considering does not require that the jury should find the destruction was total, but only that they should find that she was damaged to the extent that it would cost more to repair her than she would be worth when repaired.

Moreover, it is open to question whether the loss or destruction intended by this clause was one falling within the scope of the insurance which was stipulated for in the preceding clause. It would seem rather that the parties were supplementing those stipulations by providing for losses which would not be covered by the insurance before mentioned. But upon this we express no definite opinion, the question not having been raised or passed upon in the court below nor directly involved in the rulings we are reviewing.

It is contended for the defendant in error, and this seems to have been his theory when he refused the tender of the vessel at the expiration of the lease, that the city had no right to return the vessel unless she was returned in as good condition as she was at the time she was leased. But is this the proper construction of the contract? We do not think it was intended that the title to the vessel would pass to the city in consequence of a breach of the stipulation referred to. It was the common case of the hiring of property for a specific term. The hirer would, by implication, be bound to return the thing hired, and the gist of the stipulation is that when returned she should be in as good condition as when received. For a breach of this stipulation the lessor would have his remedy for the damages arising from the depreciation in the value of the thing hired in consequence of the breach. But the lessor cannot treat the thing hired as sold, and recover its value of the lessee. We think, therefore, that this contention of the defendant in error cannot be maintained, and that it did not follow that, because of the damaged condition of the vessel, he was entitled to refuse to accept her, and thereupon to demand the $12,000 as her value.

For the reasons stated, the judgment must be reversed, and the cause remanded, with directions to award a new trial.

Note. Judge DAY participated in the decision of this case, although not now a member of the court.