## DE FILIPPIS v. CHRYSLER CORPORATION et al.

District Court, S. D. New York.

Feb. 23, 1944.

William J. Rapp, of New York City, for plaintiff.

John B. Cunningham, of New York City (Max W. Zabel, Edward C. Gritzbaugh, and Edward U. Dithmar, all of Chicago, Ill., of counsel), for defendants.

BRIGHT, District Judge.

Plaintiff, claiming to have invented a transmission mechanism for automobiles, the use of which would eliminate parts and greatly increase efficiency in reducing the consumption of fuel, in 1931 communicated with the defendant Warner Gear Company (solely owned and controlled by the defendant Warner Corporation) regarding the possibility of interesting it in his device; that company requested him to deliver to it drawings and a description of the device, which he did, believing in the integrity and general reputation of the two corporations, and for upwards of eight months those drawings and description remained in their possession. Alleging that while so possessed the Borg Corporation copied and in 1934 and thereafter used his invention, without his authority or consent and without compensation to him, it thereby breached the relation of confidence and trust created, he brings this action for an accounting and injunction, and to recover upwards of $750,000 under an implied contract to pay him $7\frac{1}{2}\%$ of the net cost of the transmission mechanism sold by the corporation. The complaint originally set out four causes of action. Upon the trial, the second and third were dismissed, as was the complaint in its entirety as against all defendants except the Borg-Warner Corporation.

Defendant, while admitting plaintiff's communication of October 5th, 1931, and the sending of the drawings and description and their retention for upwards of eight months, denies that they were submitted in confidence or that it copied or used the same or constructed or sold any

transmission mechanisms using plaintiff's invention or any part thereof. It alleges that on June 11, 1929, long prior to the submission of the documents, plaintiff had applied for a patent to protect whatever invention was disclosed in his application; that whatever was submitted was nothing more than a copy of his patent application; and that his patent was finally issued on July 31, 1934, as No. 1,968,030. It further avers that plaintiff in February, 1937, filed suit upon that patent against the defendant Chrysler Sales Corporation; that Borg-Warner Corporation, to plaintiff's knowledge, undertook and was solely responsible for the defense of that cause, that it was dismissed with prejudice in 1938, and that dismissal is res judicata of any patentable cause of action which might have existed between plaintiff and these defendants or of any alleged infringement of plaintiff's device.

On October 5th 1931, plaintiff wrote to the Warner Transmission Company asking it if it was interested in a device that eliminates the clutch entirely, along with gears, and permits automatic shifting of speeds, and in which the well-known leverage and ratio (equivalent of gears) is always retained from infinite low to high. On October 13, 1931 the Warner Gear Company acknowledged receipt of this letter, stated it was always interested in new developments and would be glad to look over plaintiff's drawings with a sufficient description; and inquired whether plaintiff had actually built the device and tried it out in an automobile with any degree of success. On October 20th, 1931, plaintiff sent "a copy of the patent" (the patent had not then been issued and what was sent was substantially a copy of the specification later in the patent); and wrote that he had made two of the devices for bench experimental uses and one for practical car use not yet installed. On January 4, 1932, having received no reply to his last communication, he asked for an answer, stating "I have several propositions on this device and I would like to terminate same as soon as possible". The following day the company replied, apologizing for the delay, and stated that they now had quite a lot of new devices that deserved careful attention "yours being among them. We are certainly interested in your subject and will try to give you a report soon". On January 8, 1932 it wrote, stating that the general scheme had been proposed by numerous inventors, none of which had proven a practical success in the actual driving of an automobile, again inquired if he had yet installed his device in a car and what result had been obtained, and stated that they desired to give the matter further study, had forwarded it to an engineer, "and it would be too radical to introduce to the public just now". The blue print (it was apparently the photostat in ·evidence) and specifications were sent to the engineer with a statement, "It seems to me this mechanism is a little simpler than some of the others and there may possibly be some merits in the general scheme. Instead of ratchets it would probably be best to use one way roller clutches". The photostat and specifications were returned by the engineer on January 27th with a statement that it was questionable whether any adequate patent protection might be secured in light of the work that had been done on similar lines, mentioned two other transmissions "which functioned similarly", and that "I think it is a good idea to follow each one of these constructions through * * * as there are quite some possibilities in the general form".

Plaintiff again wrote on January 11th answering the letter of the 8th, stating that a search of the art disclosed no single competent or equivalent patent reference, that 35 of his claims had been allowed to date on his application for a patent; and regarding the statement that the scheme was too radical, pointed to Chrysler's "fluid power" and the Bendix automatic clutch and stated that Chrysler and several others were in the market for same and the first best proposition would possess it.

On February 16, 1932, the Gear Company wrote plaintiff again asking if his transmission had been put into a car, stating that if it proved to be practical, it probably would be interested in its application to automobiles and, asking for plaintiff's ideas as to a disposition of the device. On February 19th plaintiff wrote that he had not been in any particular hurry to place his device in a car as from his study he was absolutely positive of the expected results and performance, and stating the terms upon which he would be willing to enter into a contingent agreement, among which was that he should be paid a royalty of $7\frac{1}{2}\%$ based on factory net cost. The Gear Company wrote on February 26th that it was still giving thought to plaintiff's general construction, which was

very interesting and upon which a lot of work had been done by other inventors, but disagreeing with plaintiff's estimate of the value of his device. Plaintiff replied on February 29th changing somewhat the terms upon which he was willing to agree, stating that the 7½% which he had previously mentioned referred to the cost of the transmission only, and further that a complete model could be shipped upon a contingent agreement, which he suggested be drawn up "as I have several propositions on hand and desire to terminate the matter". On July 24, 1932, plaintiff wrote that the transmission had been licensed to the Clutchless Gearless Transmission Corporation (which was a corporation organized by him) and requested all "drawings and specifications which you may have on file". On July 27th the matter which he had sent was returned to him by the company which stated that it was glad that he had formed such an organization for development work, and as plaintiff's device did not seem to be as hopeful as some others it knew about, it had not felt that it could afford to spend money to develop it.

Nothing apparently was done in the matter after that until March 1934, when, it is shown by the evidence, defendant manufactured and sold an "overdrive" mechanism.

Plaintiff had applied for a patent for his device on June 11, 1929, and that was issued on July 31, 1934, as No. 1,968,030. The specification in his patent, as well as the drawings affixed thereto, are almost identical with the photostat and typewritten description sent to the defendant in October 1931. The only difference between the drawings is that an additional figure 7 is added; the specifications omit some immaterial matter and repetition contained in the typewritten copy sent to the defendant.

In the early part of 1937 plaintiff brought suit in this court against the Chrysler Sales Corporation, alleging that it was infringing his patent, and prayed that his patent be declared good and valid, that the defendant be enjoined from manufacturing, using and selling or further infringing, and for an accounting. The defendant Borg-Warner Corporation, to the knowledge of the plaintiff, defended that action. It was reached for trial on or about April 4, 1938, and an order was made on that day that the cause be dismissed without prejudice providing $250 was paid by plaintiff to defendant's solicitor within thirty days, and in the event no such payment was made, the cause was dismissed "on the merits and with prejudice to any further suit on the patent herein, with respect to the devices complained of herein". The payment was not made, and some time later an order was made denying any extension of time in which to make it. That order was affirmed on appeal and the judgment on the mandate of the Circuit Court of Appeals was entered on January 30, 1941. That court held that the District Court had power to dismiss with prejudice. 2 Cir., 116 F.2d 375, 376. Another action was brought by plaintiff against Studebaker Sales Corp., Borg-Warner Corporation and Nash Sales, Inc., for infringement of the same patent, in the United States District Court for the Southern District of Illinois, and that action was also dismissed on the ground that the dismissal in this court with prejudice, previously referred to, was res judicata, and that the Borg-Warner Corporation, because it had given notice that it was defending the case in this court, was entitled to the benefit of that adjudication. 49 U. S.P.Q. 487. The same claim is made in this action, but in view of what is hereafter stated, I do not think it is necessary to decide the question, although the contention would seem to have much merit. Larson v. General Motors Corp., D.C., 2 F.R.D. 294, reversed 2 Cir., 134 F.2d 450-454, (not because the plea of res judicata was not well founded, but because the judgment, 40 F.Supp. 570, upon which that plea was based had been reversed); Doherty Research Company v. Universal Oil Products Co., 7 Cir., 107 F.2d 548-550.

As the plaintiff describes his invention, it is a device which, when installed in the transmission of an automobile, permits the automatic change from first to second to third speed or to any higher speed when the foot is lifted from the accelerator pedal. After the automobile is started in first speed and the foot is so lifted for an instant, the speed of the car causes the driven shaft of the automobile (that portion of the shaft connected to the rear wheel) to run faster (overrun) than the driving shaft (that portion of the shaft from the motor or engine back to the transmission) which automatically causes a shift from first to second speed. The same operation will automatically shift to

third speed and if that is the ultimate speed of the automobile, the drive shaft then becomes positively connected to the driven shaft and there remains in a nonoverrunning connection in which both shafts are revolving at the same speed in a one to one relation. The transition from first to second to third brings into play the overrunning or free wheeling feature of plaintiff's device, but that feature entirely ceases and is locked out when the two shafts come into positive connection. Plaintiff further says that the free wheeling or overrunning feature, until the ultimate speed is reached, is controlled by a governor which is an essential part of the device. His device is, therefore, not entirely a free wheeling one; it is such at all speeds except the last. The reverse of the operation takes place by centrifugal power when the car is slowed down. The device can be operated either manually or automatically by a governor. There are no gears or clutch, and one can start his automobile from neutral and progress to the highest speed merely by the operation of the accelerator pedal.

The accused overdrive, concededly manufactured and sold by the defendant Borg-Warner, as claimed by that defendant, is a device which is used in addition to the ordinary transmission. It is located on the shaft between the transmission and the universal joint. It does not dispense with the customary engine clutch. Its purpose is to increase (overdrive) the speed of the driven shaft so that it will revolve faster than the drive shaft. This is accomplished by a set of planetary gears housed in the overdrive unit and operates only when the transmission is in high gear, and then only at the option of the operator. When the car speed is, say, forty miles per hour, the operator raises his foot from the accelerator, the engine speed, i. e. the speed of the drive shaft, drops and by centrifugal action connection is made through the gear train, and the overdrive functions. When the overdrive is functioning, the drive and driven shafts are not connected so that they rotate as one as in plaintiff's. It is only used and can only be used to increase the ultimate speed. When the overdrive is in use there is no free wheeling, it never comes into service when the car is running below a certain fixed speed; and when it is so operated, there is in effect a two way drive which means that the engine will drive the car, or if the car is going down hill, the car will drive the engine and the car is thus braked in part by the compression of the motor. There is no free wheeling with the accompanying danger of the car running wild. Whether there is to be any free wheeling is entirely controlled by the driver of the car. It can be locked out completely by a knob on the dash of the car, and the lock out is entirely separate and apart from the overdrive device. Similarly, the use of the overdrive is optional with and subject to the control of the operator.

Distinction was made during the trial between "overrunning" and "overdriving". As defined, an overrunning device is one by which the driven shaft is disconnected from the drive shaft when the speed of the driven exceeds that of the drive. The overdrive device drives the driven shaft faster than the drive shaft by means of connecting gears and does not permit overrunning. The overrunning permits the car to run faster than the drive shaft; the overdrive compels the car to go faster.

■ It seems to be well settled that where an inventor, between the date of his application for a patent and its grant, discloses some novel feature of his invention to another in strict confidence, and that other subequently uses the information so disclosed to his advantage, he may be held liable to the inventor for damages on the theory of unjust enrichment, not so much for the use of the property right itself, but for the violation of the confidence. Du-Pont de Nemours Powder Co. v. Masland, 244 U.S. 100–102, 37 S.Ct. 575, 61 L.Ed. 1016; Booth v. Stutz Motor Car Co., 7 Cir., 56 F.2d 962–966; Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912–923, certiorari denied 298 U.S. 673, 56 S.Ct. 938, 80 L.Ed. 1395; Gilbert v. General Motors Corp., D.C., 41 F.Supp. 525–527, affirmed 2 Cir., 133 F.2d 997, certiorari denied 319 U.S. 743, 63 S.Ct. 1031.

■ To sustain such a cause of action, plaintiff has the burden of proving (1) that there was a disclosure in confidence, Canfield v. Blaw-Knox Co., 3 Cir., 98 F.2d 805, 806; Picard v. United Aircraft Corp., 2 Cir., 128 F.2d 632–637, certiorari denied 317 U.S. 651, 63 S.Ct. 46; Rosenthal v. Celanese Corp., 2 Cir., 135 F.2d 405, 406; (2) the disclosure must be of something novel, he could not recover for something old which he may have disclosed, Flanigan v. Ditto, Inc., 7 Cir., 91

F.2d 1–3, certiorari denied 302 U.S. 758, 58 S.Ct. 363, 82 L.Ed. 586; Smoley v. New Jersey Zinc Co., D.C., 24 F.Supp. 294–300, affirmed, 3 Cir., 106 F.2d 314; and (3) that the feature disclosed has been adopted and made use of. Hunyady v. General Motors Corp., 7 Cir., 84 F.2d 61–64; Gilbert v. General Motors Corp., 2 Cir., 133 F.2d 997, certiorari denied 319 U.S. 743, 63 S.Ct. 1031; Rosenthal v. Celanese Corp., supra; Canfield v. Blaw-Knox Co., supra; Pennington Engineering Co. v. Houde Engineering Corp., 2 Cir., 136 F.2d 210–216, certiorari denied 64 S.Ct. 84, 88 L.Ed. ——. Of course, the subsequent granting of a patent added nothing to the cause of action; if there was a wrongful disregard of confidential relations in the respects just mentioned, a patent would not be requisite to protect the plaintiff. Becher v. Contoure Laboratories, 279 U.S. 388–391, 49 S.Ct. 356, 73 L.Ed. 752.

Assuming that whatever disclosure was made by plaintiff was in strict confidence, I think he has failed to prove that he disclosed anything novel or patentable, or that the defendant has appropriated or used anything that he so disclosed.

Plaintiff contends that his disclosure was of a combination, the novel features of which were (1) an overrunning device, (2) a lock out for the same, and (3) a centrifugal governor which would automatically lock out the overrunning at a predetermined speed and cause the driven and drive shafts to come into a positive connection. He alleges that the defendant has taken all three in combination.

The overrunning feature and its lock out were not novel. Plaintiff admits that they were old. And it is proven that the defendant manufactured and used them in 1930. That leaves as a basis of his claim that by his invention he has added to the free wheeling plus the cut out a governor which automatically brings the last speed in the transmission to a non-overrunning positive connection between the two shafts; that is, that the governor or centrifugal force causes, or actuates as he expresses it, the positive connection between the two shafts, and at the same time locks out the free wheeling or overrunning feature.

Plaintiff, in my opinion, did not disclose any such action by the governor in the drawings and typewritten specification sent to the defendant in 1931. The drawings disclosed a governor attached to that portion of the plaintiff's device which controlled only the speed of the driven shaft. The description, referable to the drawing, as shown in the second paragraph on page 10 of his typewritten disclosure, which is the only place at which there is any reference to a governor, reads:

"The invention can automatically control the speed of the driven shaft, for which purpose, a governor 57 is provided. The same is connected to an arm 24 by a link 58 having detachable hook connection with the said arm at 59. By disconnecting the link the speed of the driven shaft is controlled manually only. However, when connected, the governor which is located either to the front or the rear of the arm 24, turns the latter, and hence the screw 23, thus varying the length of the reciprocation of member 28, and changing the speed of the driven shaft accordingly."

The description of the governor and its purpose has no reference in any way to a device which will automatically shift the driven shaft in order that a positive connection between it and the drive shaft may be obtained at the ultimate speed. Plaintiff says, however, that that appears in the first paragraph on the same page which reads:

"The lengthwise movement of the shaft 31 may be obtained in various ways. Thus a collar 53 may be provided therein, which is engaged by a lever 54, pivotally mounted at 55, and operated by a rod 56. The three progressive positions of the shaft for driving in forward, then in reverse, and finally in direct, are thus easily obtained by a progressive movement of the actuating rod 56. The latter may be manipulated manually, or in any other desired manner."

The last sentence of that paragraph is the one to which plaintiff points as disclosing such a governor. What other "desired manner" may be used is nowhere shown or described. If it was to be accomplished by a governor, plaintiff could have said so, as he had shown with reference to the control of the speed. If by the use of those words he meant to leave it to those skilled in the art to figure out what other "desired manner" would be used, it cannot be said that it would be novel. And if the patent later obtained is any indication of what plaintiff meant by the quoted words, it is to be observed that nowhere in his claims does he attribute any function to the governor other than to control the speed of the driven

shaft. In each instance in his claims where mention is made, it is referred to as a "speed governor". It is strange that as this is obviously the most important feature claimed for his device, and admittedly the only one that could be said to be novel, that he did not disclose it definitely, and in detail, as he did in the next paragraph with reference to his speed governor. It certainly could not have been considered important when he sent the description to the defendant, or it would not have been left to guesswork.

Nor do I think plaintiff has shown any appropriation by defendant of any novel disclosure made by him. It is true that defendant's "over drive" does make use of the free wheeling in order to bring into play the overdrive and also the lock out. But all that was old. That combination is brought into play in the same manner as in plaintiff's device, by the momentary lifting of the foot from the accelerator pedal. But the subsequent result and function is entirely different from plaintiff's. At the ultimate speed in his device, the drive and driven shafts are brought into a direct and positive one to one connection; both shafts then revolve at the same speed. In the defendant's device, when the "overdrive" starts to function the two shafts are not in direct communication nor in a one to one relation; they are connected only through a series of planetary gears as a result of which the drive shaft operates at a lesser number of revolutions than the driven; as it was testified in a 7 to 10 relation. What really happens is that an additional car speed and speed of the driven shaft results. Plaintiff's device is not an overdrive; it cannot under any circumstances operate the driven shaft at a greater speed than the drive.

Plaintiff contends that the gearing up of the speed of the driven shaft can be accomplished by the use of gears in the differential. But that is not part of his device, nor part of the defendant's. Plaintiff's features are contained in the transmission, whereas in the defendant's, the transmission with its manually operated gear shift lever is conventional; the "overdrive" is in an entirely separate mechanism to the rear of the transmission. And it seems to me that plaintiff's entire mechanism was anticipated by the patent granted to Rex E. Keller, No. 1,734,491, on November 5, 1929.

In view of what has been said, there could be no implied contract to pay for a device not novel nor used by the defendant. Lueddecke v. Chevrolet Motor Co., 8 Cir., 70 F.2d 345–347; Young v. Ralston-Purina Co., 8 Cir., 88 F.2d 97–101; American Mint Corp. v. Ex-Lax, Inc., 263 App.Div. 89, 31 N.Y.S.2d 708.

It follows that the complaint is dismissed upon the merits, with costs. Findings may be presented within ten days from this date and plaintiff may have five days after the service of them in which to object to any parts thereof.