

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-21-2004

# Baer v. Chase

Precedential or Non-Precedential: Precedential

Docket No. 04-1655

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Baer v. Chase" (2004). *2004 Decisions*. Paper 12.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/12

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————

No. 04-1655

————

ROBERT V. BAER,

<u>Appellant</u>

v.

DAVID CHASE; CHASE FILMS INC.,
A Delaware Corporation; JOHN DOES A-Z

————

On Appeal from the United States District Court
for the New Jersey
(D.C. Civ. No. 02-02334)
District Judge: Honorable Joel A. Pisano

————

Argued October 28, 2004

BEFORE: SCIRICA, <u>Chief</u> <u>Judge</u>, and FISHER and GREENBERG,
<u>Circuit</u> <u>Judges</u>.

(Filed: December 21, 2004)

————

Robert V. Baer (argued)
4 Laurel Road
Wayne, NJ 07870
Harley D. Breite
562 Black Oak Ridge Road
Wayne, NJ 07470
Michael S. Kasanoff
157 Broad Street, Suite 321
P.O. Box 8175
Red Bank, NJ 07701

    <u>Attorneys for Appellant</u>

Peter L. Skolnick (argued)
Michael A. Norwick
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, NJ 07068

  Attorneys for Appellees

———

OPINION OF THE COURT

———

GREENBERG, Circuit Judge.

This matter comes on before this court on Robert V. Baer's ("Baer") appeal from an order of the district court entered February 20, 2004, granting summary judgment to the defendants, David Chase and DC Enterprises, Inc. (together called "Chase"), pursuant to Federal Rule of Civil Procedure 56(c). This dispute centers on the creation and development of the well-known television series, The Sopranos. Through this action, Baer seeks compensation for what he perceives was his role in the creation and development of the popular and financially successful television series.

## I. FACTUAL AND PROCEDURAL HISTORY

Chase, who originally was from New Jersey, but relocated to Los Angeles in 1971, is the creator, producer, writer and director of The Sopranos. Chase has numerous credits for other television productions as well. Before Chase met Baer, Chase had worked on a number of projects involving organized crime activities based in New Jersey, including a script for "a mob boss in therapy," a concept that, in part, would become the basis for The Sopranos.

In 1995, Chase was producing and directing a Rockford Files "movie-of-the–week" when he met Joseph Urbancyk who was working on the set as a camera operator and temporary director of photography. Chase mentioned to Urbancyk that he was looking for new material and for writers who could develop feature film

screenplays that Chase later might re-write and direct.   Urbancyk also overheard Chase say that the creators of <u>The Rockford Files</u> were looking to assign additional writers for their "movie of the week" project.

Urbancyk became the connection between Chase and Baer as a result of Urbancyk's long-time friendship with Baer and his knowledge of Baer's interest in pursuing a career in writing, directing and producing.   Baer, who was a New Jersey attorney, recently had left his employment in the Union County Prosecutor's Office in Elizabeth, New Jersey, where he had worked for the previous six years.

Urbancyk urged Baer to write a script for <u>The Rockford Files</u>. Baer did so and gave it to Urbancyk who passed it on to Chase.  Chase considered Baer's work "interesting" and asked Urbancyk if Baer had any plans to be in Los Angeles.  Upon hearing of Chase's interest, Baer flew to Los Angeles to meet with Chase.

Chase, Urbancyk and Baer met for lunch on June 20, 1995.  At that time Chase informed Baer that he would be unable to use Baer's screenplay, as the remaining slots in <u>The Rockford Files</u> had been filled.  The lunch continued, however, with Baer describing his experience as a prosecutor.  Baer also pitched the idea to shoot "a film or television shows about the New Jersey Mafia."  App. at 40.  At that time Baer was unaware of Chase's previous work involving mob activity premised in New Jersey.  At the lunch there was no reference to any payment that Chase might make to Baer for the latter's services and the parties agree that they did not reach any agreement on that day.

In October 1995, Chase visited New Jersey for three days. During this "research visit" Baer arranged meetings for Chase with Detective Thomas Koczur, Detective Robert A. Jones, and Tony Spirito who provided Chase with information, material and personal stories about their experiences with organized crime.   Koczur served as a tour guide and drove Chase and Baer to various locations in northern New Jersey.   Koczur also arranged a lunch between Chase and Spirito.   Spirito told true and sometimes personal stories involving loan sharking, a power struggle with two uncles involving a family business, and two individuals, Big Pussy and Little Pussy

Russo.[1]  Chase also met with Jones, a detective with the Union County Prosecutor's office who had experience investigating organized crime.  Baer does not dispute that virtually all of the ideas and locations that he "contributed" to Chase existed in the public record.

After returning to Los Angeles, Chase sent Baer a copy of a draft of a Sopranos screenplay that he had written, which was dated December 20, 1995.  Baer asserts that after he read it he called Chase and made various comments with regard to it.  Baer claims that the two spoke at least four times during the following year and that he sent a letter to Chase dated February 10, 1997, discussing The Sopranos script.  Baer ensured that Chase received the letter by confirming its arrival with Chase's assistant.  On this appeal we accept Baer's allegations regarding his input into The Sopranos draft.

Notwithstanding his February 10, 1997 letter, at his deposition Baer claimed that he last rendered services to Chase in 1995.  Thus, Baer's testimony included the following:

> Q.  During any of those conversations after October of 1995, [when Chase visited New Jersey] did you provide any further information to Mr. Chase other than in relation to the sexual assault?
>
> A.  Not really.
>
> Q.  No?
>
> A.  Not really.  The screen play was done and there wasn't really any need for it at that point as far as I knew.

---

[1]These or similar story lines and characters have appeared in episodes of The Sopranos.

> Q. So everything that
> you had done and to
> which you claim
> entitlement was done by
> the end of October 1995?
>
> A. Yes in terms of
> assisting him in helping
> with this project that
> would be true.

App. at 343-44.[2] Notwithstanding this testimony, in Baer's later certification dated October 3, 2003, in opposition to Chase's motion for summary judgment he sought to clarify his deposition testimony, stating:

> 117. I also sent him a
> letter dated February 10,
> 1997 discussing the
> Sopranos script prior to
> making a trip to Los
> Angeles. After sending
> the letter, I spoke with
> Chase's assistant, Kelly
> Kockzak, who confirmed
> that Chase had received
> it. This letter represents
> the last services I
> provided to Defendants.
> Most of my services
> were provided in 1995.

App. at 69.

Baer asserts that he and Chase orally agreed on three separate occasions that if the show became a success, Chase would "take care of" Baer, and "remunerate [Baer] in a manner commensurate to the true value of [his services]." App. at 113. According to Baer, he and Chase first made this oral agreement on the telephone during one of their first two or three conversations during the summer of 1995. The

---

[2]The reference to the "sexual assault" is not material to the issues here.

5

second occasion was on the telephone and occurred immediately prior to Chase's October 1995 visit to New Jersey. The third time the parties reached the agreement was in person when they met in New Jersey in October 1995.

Baer claims that on each of these occasions the parties had the same conversation in which Chase offered to pay Baer, stating "you help me; I pay you." App. at 112-13. Baer always rejected Chase's offer, reasoning that Chase would be unable to pay him "for the true value of the services [Baer] was rendering." Id. Each time Baer rejected Chase's offer he did so with a counteroffer, "that I would perform the services while assuming the risk that if the show failed [Chase] would owe me nothing. If, however, the show succeeded he would remunerate me in a manner commensurate to the true value of my services." Id. at 113. Baer acknowledges that this counteroffer, which in these proceedings we treat as having become the parties' agreement, always was oral and did not include any fixed term of duration or price. There is no other evidence in the record of any other discussion between Baer and Chase regarding the terms of the contract. For purposes of the motion for summary judgment, Chase accepts Baer's version of the events as true and thus concedes there was an oral agreement to the extent that Baer sets it forth. Notwithstanding this agreement, insofar as we can ascertain, other than Baer's calls to Chase after he received the Sopranos script, the next time Baer heard anything from or about Chase was when he received a phone call from Detective Koczur telling him that Chase was in Elizabeth shooting The Sopranos. In fact, Chase has not paid Baer for his services.

On or about May 15, 2002, Baer filed a verified complaint against Chase in the district court and thereafter on May 2, 2003, Baer filed an amended verified complaint. Baer's amended complaint advanced ten claims: (1) breach of contract; (2) breach of implied contract; (3) breach of quasi-contract; (4) common law fraud; (5) equitable fraud; (6) negligent misrepresentation; (7) breach of fiduciary duty; (8) unfair competition under section 43(a) of the Lanham Act, 15 U.S.C. § 1125; (9) unfair competition and misappropriation under N.J. Stat. Ann. § 56:4-1 (West 2001); and (10) tortious interference with prospective economic advantage. App. at 137-48. Baer subsequently withdrew the federal unfair competition

claim.[3] Eventually Chase brought a motion for summary judgment under Federal Rule of Civil Procedure 56(c) alleging that there was no genuine issue as to any material fact and he was entitled to a judgment as a matter of law. Chase claimed that the alleged contract and implied contract were too vague, ambiguous and lacking in essential terms to be enforced and the statute of frauds barred the actions based on them. Moreover, Chase claimed that the statute of limitations barred the breach of quasi-contract quantum meruit claim. Finally, Chase alleged that each of Baer's six remaining claims was lacking in merit. Baer did not file a cross-motion for complete or partial summary judgment.

The district court granted Chase's motion, concluding that there was no genuine issue of material fact with respect to any of Baer's claims. The district court held with respect to the claims raised on this appeal that: the contract claims were unenforceable due to vagueness, uncertainty, and the lack of essential terms in the contract; the statute of limitations barred the quasi-contract claim; and the misappropriation tort claim was without merit due to a lack of novelty. In addition, the district court made certain rulings with respect to evidence that we describe below which Baer challenges.

II.     JURISDICTION AND STANDARD OF REVIEW

The district court exercised diversity jurisdiction pursuant to 28 U.S.C. § 1332 in that the parties were of diverse citizenship and the amount in controversy exceeded $75,000 exclusive of interest and costs. Our jurisdiction is founded on 28 U.S.C. § 1291, as this timely appeal is from a final order of the district court granting Chase's motion for summary judgment. We make a plenary review of the district court's order granting summary judgment to Chase. See

---

[3]The district court indicated that Baer partially withdrew his federal and state unfair competition and misappropriation claims, Baer v. Chase, No. Civ. A. 02-CV-2334, 2004 WL 350050, at *1 n.1 (Feb. 20, 2004), and the docket entries support this statement but indicate that the entire misappropriation claim was withdrawn. See app. at 34. Yet the court discussed the state unfair competition and misappropriation claim at length, id. at *12-14, and rejected them on the merits. Moreover, the parties substantively have briefed the misappropriation claim so we regard it as still in the case.

7

Fakete v. Aetna, Inc., 308 F.3d 335, 337 (3d Cir. 2002) (citing Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 566 n.3 (3d Cir. 2002)). Insofar as the case involves state law, New Jersey law is applicable.


## III.  DISCUSSION

### A.  Baer's Implied-In-Fact Contract Claim

Baer predicates his contract claim on this appeal on an implied-in-fact contract rather than on the oral agreement he reached with Chase.  The issue with respect to the implied-in-fact contract claim concerns whether Chase and Baer entered into an enforceable contract for services Baer rendered that aided in the creation and production of The Sopranos.  In the district court Baer offered two alternative theories in which a purported contract was formed:  the "oral agreement/success contingency" and an implied-in-fact contract.

The parties agree for purposes of the summary judgment motion that there was a contingent oral agreement providing for Chase to compensate Baer, depending on Chase's "success," in exchange for the aid Baer provided in the creation and production of The Sopranos. As we noted above, the parties reached the oral agreement in three exchanges in which Baer proposed: "that I would perform the services while assuming the risk that if the show failed [Chase] would owe me nothing.  If, however, the show succeeded he would remunerate me in a manner commensurate to the true value of my services."  App. at 113.  As we have indicated, for purposes of the summary judgment motion only, Chase accepts this version of the events so we will regard the existence of the oral agreement as not in dispute.

The district court held, and Baer concedes on appeal, that this oral agreement was "too vague to be enforced" as an express contract. Appellant's br. at 30-31; see Baer v. Chase, No. Civ. A. 02-CV-2334, 2004 WL 350050, at *6 (Feb. 20, 2004) ("The contract as articulated by the Plaintiff lacks essential terms, and is vague, indefinite and uncertain; no version of the alleged agreement contains sufficiently precise terms to constitute an enforceable contract.").  This description of the oral agreement leaves at issue Baer's contention that the district court overlooked the existence of an enforceable implied-in-fact contract, rendering Chase liable for the services that Baer

8

provided.

          1. The Distinction Between Express And Implied–In-
             Fact Contracts

       The distinction between express and implied contracts rests on alternative methods of contract formation. Contracts are "express" when the parties state their terms and "implied" when the parties do not state their terms. The distinction is based not on the contracts' legal effect but on the way the parties manifest their mutual assent. In re Penn. Cent. Transp. Co., 831 F.2d 1221, 1228 (3d Cir. 1987) ("An implied-in-fact contract, therefore, is a true contract arising from mutual agreement and intent to promise, but in circumstances in which the agreement and promise have not been verbally expressed. The agreement is rather inferred from the conduct of the parties."); see Baltimore O.R. Co. v. United States, 261 U.S. 592, 597, 43 S.Ct. 425, 426-27 (1923). In other words, the terms "express" and "implied" do not denote different kinds of contracts, but rather reference the evidence by which the parties demonstrate their agreement. See St. Paul Fire & Marine Ins. Co. v. Indem. Ins. Co. of N. Am., 158 A.2d 825, 828 (N.J. 1960).

       Baer's attempt to find an implied-in-fact contract in his dealings with Chase does not strengthen his claim that Chase breached his contract with him. There is only one contract at issue, Chase's promise to compensate Baer for services he rendered which aided in the creation and production of The Sopranos. Chase's stipulation that there was such a contract has the consequence of making Baer's attempts to label this agreement "implied" rather than "express" to advance a distinction without a difference as the mode of contract formation, as we will explain, is immaterial to the disposition of the breach of contract claim. In other words, inasmuch as the parties agree for purposes of these summary judgment proceedings that there was an agreement, the manner in which they formed the contract is immaterial because different legal consequences do not flow from analyzing the alleged contract as implied-in-fact rather than express. See Saint Barnabas Med. Ctr. v. Essex County, 543 A.2d 34, 39 (N.J. 1988) (quoting St. Paul Fire & Marine Ins. Co., 158 A.2d at 828 ("[A] true contract implied in fact 'is in legal effect an express contract,' and varies from the latter only insofar as the parties' agreement and assent thereto have been manifested by conduct instead of words."). The district court was therefore correct in its holding that "[b]ecause the Defendants have assumed the existence of a contract as

9

the Plaintiff has described it for the purposes of the motion there is no issue regarding formation of the contract or assent, and the Plaintiff's distinction between express and implied contracts is irrelevant." Baer, 2004 WL 350050, at *5 (citations omitted).

Moreover, Baer's claim of an implied-in-fact contract, in the face of an express agreement governing the same subject matter, is legally untenable. There cannot be an implied-in-fact contract if there is an express contract that covers the same subject matter. In re Penn Cent. Transp. Co., 831 F.2d at 1229-30; see Klebe v. United States, 263 U.S. 188, 191-92, 44 S.Ct. 58, 58-59 (1923). In other words, express contract and implied-in-fact contract theories are mutually exclusive.

In In re Penn Central Transportation Company, 831 F.2d 1221, we addressed the relationship between express and implied contracts. In that case the government sought recovery under the Regional Rail Reorganization Act for funds it paid to Penn Central in an attempt to sustain routine operations at the financially ailing railroad company. The government and the railroad had entered into a number of express agreements pursuant to the Act to effectuate these loans. The government later claimed that Penn Central performed unauthorized work, resulting in the overpayment of $22.3 million to it. The government argued that the Act dictated the specific and limited manner in which the government loan money could be utilized, and, accordingly, sought return of its funding expended on "unauthorized" activities.

In response, Penn Central put forth an interpretation of the Act in which the alleged unauthorized activities would have been acceptable under its requirements. In the alternative, it maintained that it had an entered into a separate and enforceable implied-in-fact contract with the government to continue using these funds for the activities in which it was engaged, even if they were deemed outside the scope of the Act. Id. at 1225.

We focused on and disallowed the railroad's attempt to prove the existence of both express and implied-in-fact agreements dealing with the same subject. We stated, "no implied-in-fact contract may be found when, as here, the parties have an express agreement dealing with the same subject." Id. at 1229. The operative principle here and in Penn Central Transportation Company is the same. As noted above, there is only one agreement at issue in the present case,

Chase's promise to pay Baer for the services he rendered. Chase concedes the existence of the oral express agreement as alleged by Baer. Consequently, the fundamental contract law principle that implied and express contacts are mutually exclusive forecloses Baer's attempt to establish that there was an implied-in-fact contract.

New Jersey law, applicable here, recognizes the mutual exclusivity of express and implied contracts. Roselle Park Bldg. & Loan Ass'n v. Friedlander, 181 A. 316, 317 (N.J. Sup. Ct. 1935) ("[I]t is axiomatic that a contract cannot arise by implication in fact where there is an express contract between the parties relating to the same subject matter. . . ."). The existence of an express contract, however, does not preclude the existence of an implied contract if the implied contract is distinct from the express contract. Atlas Corp. v. United States, 895 F.2d 745, 754-55 (Fed. Cir. 1990); see Chase Manhattan Bank v. Iridium Africa Corp., 239 F. Supp. 2d 402, 409 (D. Del. 2002) ("A party may assert the existence of an express contract and implied-in-fact contract only if the terms of the contracts alleged differ in some manner."); ITT Fed. Support Servs., Inc. v. United States, 531 F.2d 522, 528 n.12 (Ct. Cl. 1976) ("The implied contract, if it is to be valid, must be entirely unrelated to the express contract. The existence of an express contract precludes the existence of an implied contract dealing with the same subject.").

Baer's alleged implied-in-fact contract, however, rather than being distinct from or unrelated to the express oral contract is identical to it. The stipulated oral agreement included Chase's promise to compensate Baer for the services and ideas that Baer provided Chase. Baer now asks that we find an implied-in-fact contract that subjects Chase to liability for the very same undertaking. Baer provides a litany of facts which indicate that Chase may have used his services or prospered from his ideas. Nevertheless, in light of Chase's stipulation to the existence of an agreement governing this subject matter, this evidence is immaterial to the issues raised by the summary judgment motion with respect to Baer's attempt to establish that there was an implied-in-fact contract between the parties.

The question is not whether Chase entered into an agreement with Baer or whether Chase utilized his ideas. We already deem these matters, for the purposes of the motion for summary judgment and this appeal, as established. The question is whether Chase's non-verbal actions prove there was a contract distinct from the express agreement or expanding on the terms of the agreement to make it

11

enforceable. The answer is clearly that the actions do not do so. The alleged implied-in-fact contract completely mirrors the acknowledged express contract's subject matter. Baer nowhere demonstrates that the subject matter of the alleged implied-in-fact contract is distinct, more definite in terms of price and duration, or covers a subject matter divergent from the oral agreement. The district court, therefore, would have erred if it had analyzed this case on the basis that there was a separate implied-in-fact contract distinct from the express contract that governed the identical subject matter.

2.  Definitiveness As To Price and Duration In An "Idea Submission" Case

Even assuming that Baer had been able to demonstrate that he had an implied-in-fact contract with Chase, his contention that an implied-in-fact contract claim in an idea submission case need not be definite as to price and duration, would be incorrect. Baer asserts that the district court's holding "that the absence of a price and duration term render[s] an implied contract in an idea submission scenario too vague to be enforced . . . is contrary to the law in virtually every jurisdiction that has ever considered the issue." Appellant's br. at 34. Baer's claim fails on three grounds: (1) there is no distinction between express and implied contracts, aside from issues of contract formation; (2) definiteness with respect to price and duration is necessary for idea submission cases under New Jersey contract law; and (3) the district court was correct in holding that the contract Baer alleges existed was too ambiguous and indefinite to be enforceable.

a.  An Implied-In-Fact Contract Has The Same Legal Consequences As An Express Contract.

In fact there are no distinctions in legal effect, at least in the context of this case, when a promise is implied rather than express. See Duffy v. Charles Schwab & Co., 123 F. Supp. 2d 802, 816-17 (D.N.J. 2001) ("The only difference between an implied-in-fact contract and an express contract is that the parties' agreement has been manifested by conduct instead of words."). No rationale exists to conclude that definiteness as to the essential terms of a contract could be an exception from this fundamental principle. We therefore determine if in any "idea submission case," whether predicated on an express or implied contract, definiteness is a requirement to create an enforceable contract.

12

> b. A Contract Involving An Idea Submission Must Be Definite With Respect To All Essential Terms To Be Enforceable Under New Jersey Contract Law.

In fact "[a] contract arises from offer and acceptance, and must be sufficiently definite so 'that the performance to be rendered by each party can be ascertained with reasonable certainty.'" Weichert Co. Realtors v. Ryan, 608 A.2d 280, 284 (N.J. 1992) (citing West Caldwell v. Caldwell, 138 A.2d 402, 410 (N.J. 1958); Friedman v. Tappan Dev. Corp., 126 A.2d 646, 650-51 (N.J. 1956); Leitner v. Braen, 143 A.2d 256, 259-60 (N.J. Super. Ct. App. Div. 1958)). Therefore parties create an enforceable contract when they agree on its essential terms and manifest an intent that the terms bind them. West Caldwell, 138 A.2d at 410; see Johnson & Johnson v. Charmley Drug Co., 95 A.2d 391, 397 (N.J. 1953); California Natural v. Nestle Holdings, Inc., 631 F. Supp. 465, 470 (D.N.J.1986). If parties to an agreement do not agree on one or more essential terms of the purported agreement courts generally hold it to be unenforceable. Weichert, 608 A.2d at 284 (citing Heim v. Shore, 151 A.2d 556, 561-62 (N.J. Super. Ct. App. Div. 1959) (holding agreement unenforceable because parties did not agree on terms of payment, principal amount of mortgage, due date, and interest rate)).

New Jersey contract law focuses on the performance promised when analyzing an agreement to determine if it is too vague to be enforced. "An agreement so deficient in the specification of its essential terms that the performance by each party cannot be ascertained with reasonable certainty is not a contract, and clearly is not an enforceable one." Lo Bosco v. Kure Eng'g Ltd., 891 F. Supp. 1020, 1025 (D.N.J. 1995) (citing Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l Bank, 395 A.2d 222, 227 (N.J. Super. Ct. App. Div. 1978)). A contract, therefore, is unenforceable for vagueness when its essential terms are too indefinite to allow a court to determine with reasonable certainty what each party has promised to do. Weichert, 608 A.2d at 284; see West Caldwell, 138 A.2d at 410 ("To be enforceable as a contractual undertaking, an agreement must be sufficiently definite in its terms that the performance to be rendered by each party can be ascertained with reasonable certainty.").

New Jersey law deems the price term, i.e., the amount of compensation, an essential term of any contract. MDC Inv. Prop., L.L.C. v. Marando, 44 F. Supp. 2d 693, 698-99 (D.N.J. 1999) (citing

13

Weichert, 608 A.2d at 287). An agreement lacking definiteness of price, however, is not unenforceable if the parties specify a practicable method by which they can determine the amount. Moorestown Mgmt., Inc. v. Moorestown Bookshop, Inc., 249 A.2d 623, 628 (N.J. Super. Ct. Ch. Div. 1969). However, in the absence of an agreement as to the manner or method of determining compensation the purported agreement is invalid. Weichert, 608 A.2d at 287. Additionally, the duration of the contract is deemed an essential term and therefore any agreement must be sufficiently definitive to allow a court to determine the agreed upon length of the contractual relationship. Lo Bosco, 891 F. Supp. at 1026 ("With regard to contracts for services in return for a percentage of some yet-to-be-determined number, such as profits, sales, etc., the courts [of and in New Jersey] look to whether there are certain dates of commencement and termination.").

The New Jersey Supreme Court explicitly has held that an implied-in-fact contract "must be sufficiently definite [so] that the performance to be rendered by each party can be ascertained with reasonable certainty." Weichert, 608 A.2d at 284 (citations and internal quotations omitted). If possible, courts will "attach a sufficiently definite meaning to the terms of a bargain to make it enforceable[,]" Paley v. Barton Sav. and Loan Ass'n, 196 A.2d 682, 686 (N.J. Super. Ct. App. Div. 1964), and in doing so may refer to "commercial practice or other usage or custom." Lynch v. New Deal Delivery Serv. Inc., 974 F. Supp. 441, 458 (D.N.J. 1997). But the courts recognize that a contract is "unenforceable for vagueness when its terms are too indefinite to allow a court to determine with reasonable certainty what each party has promised to do." Id. at 457.

Baer premises his argument on his view that New Jersey should disregard the well-established requirement of definiteness in its contract law when the subject-matter of the contract is an "idea submission." He cites extensively to a string of cases from various jurisdictions which he urges support his contention. See, e.g., Wrench L.L.C v. Taco Bell Corp., 256 F.3d 446 (6th Cir. 2001); Nadel v. Play-by-Play Toys & Novelties, Inc., 208 F.3d 368 (2d Cir. 2000); Duffy, 123 F. Supp. 2d 802. Baer contends that these cases support the proposition that "[e]very Circuit that has published on the issue, has upheld implied contract claims where price and duration were absent and a price term was implied as the reasonable value of the ideas conveyed." Appellant's br. at 34.

14

Baer's argument is inaccurate and misleading.   He attempts to transform cases where the issues raised pertain to adequacy of consideration and discrepancies over the use of submitted facts, into the proposition that implied-in-fact contracts involving idea submissions need not be sufficiently definite.  For example: Wrench, 256 F.3d at 459-63, reversed a summary judgment disposition that held that novelty was required to prove consideration and sustain an implied-in-fact contract claim; Duffy, 123 F. Supp. 2d at 816-19, held that a plaintiff must prove that an idea disclosed to the defendant was novel in order to find consideration for the alleged contract and denied summary judgment because a material issue existed over novelty and use; Nadel, 208 F.3d at 374, reversed a summary judgment granted "only on ground that [the plaintiff's] idea lacked general novelty and thus would not suffice as consideration" and remanded for the district court to determine "whether the other elements necessary to find a valid express or implied-in-fact contract are present here." Id. at 382. None of the cases Baer cites holds that there is not a definiteness requirement necessary to create an enforceable contract in idea submission cases.  Duffy's holding is helpful in summarizing the actual law to be derived from the above cited cases: "The existence of novelty to the buyer only addresses the element of consideration necessary for the formation of a contract.  Thus, apart from consideration, the formation of a contract will depend upon the presence of other elements." Duffy, 123 F. Supp. 2d at 818 (citing Nadel, 208 F.3d at 377 n.5).

New Jersey precedent does not support Baer's attempt to carve out an exception to traditional principles of contract law for submission-of-idea cases.  The New Jersey courts have not provided even the slightest indication that they intend to depart from their well-established requirement that enforceability of a contract requires definiteness with respect to the essential terms of that contract. Accordingly, we will not relax the need for Baer to demonstrate definiteness as to price and duration with respect to the contract he entered into with Chase.

> ### 3. The Alleged "Contract" Regardless Of Labels Is Too Vague To Be Enforced.

The final question with respect to the Baer's contract claim, therefore, is whether his contract is enforceable in light of the traditional requirement of definitiveness in New Jersey contract law for a contract to be enforceable.  A contract may be expressed in

15

writing, or orally, or in acts, or partly in one of these ways and partly in others. Troy v. Rutgers, 774 A.2d 476, 482-83 (N.J. 2001). There is a point, however, at which interpretation becomes alteration. In re Penn Cent. Transp. Co., 831 F.2d at 1226 (citing Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1011 (3d Cir. 1980)). In this case, even when all of the parties' verbal and non-verbal actions are aggregated and viewed most favorably to Baer, we cannot find a contract that is distinct and definitive enough to be enforceable.

Nothing in the record indicates that the parties agreed on how, how much, where, or for what period Chase would compensate Baer. The parties did not discuss who would determine the "true value" of Baer's services, when the "true value" would be calculated, or what variables would go into such a calculation. There was no discussion or agreement as to the meaning of "success" of The Sopranos. There was no discussion how "profits" were to be defined. There was no contemplation of dates of commencement or termination of the contract. And again, nothing in Baer's or Chase's conduct, or the surrounding circumstances of the relationship, shed light on, or answers, any of these questions. The district court was correct in its description of the contract between the parties: "The contract as articulated by the Plaintiff lacks essential terms, and is vague, indefinite and uncertain; no version of the alleged agreement contains sufficiently precise terms to constitute an enforceable contract." Baer, 2004 WL 350050, at *6. We therefore will affirm the district court's rejection of Baer's claim to recover under a theory of implied-in-fact contract.

### B. Baer's Quasi-Contract Claim

Our rejection of Baer's implied-in-fact contract claim does not preclude him from recovering on his quasi-contract claim and thus in view of the district court's disposition of that claim we consider when the statute of limitations started running on it. This inquiry has two parts: (1) application of the discovery rule; and (2) whether the district court erred in disregarding Baer's certification in opposition to Chase's motion for summary judgment, particularly when it is clear that evidence in the record corroborated the certification. The court disregarded the certification on the grounds that it conflicted with Baer's prior deposition testimony. This statute of limitations inquiry is critical as the district court did not reject the quasi-contract claim on the merits, and there is no doubt that in an appropriate case, depending on the facts, that a party may recover on a quasi-contract

16

claim even if there was no actual contract.

If, in fact, Baer's deposition was accurate, everything to which he claims entitlement for compensation had been completed by the end of October 1995, some six years and seven months before he filed this lawsuit. In that circumstance, as we explain below, the district court would have held correctly that the New Jersey statute of limitations barred Baer's quasi-contract claim unless the discovery rule postponed the commencement of the limitations period. But the deposition testimony may have been incomplete as there is evidence in the record refuting the portion of it indicating that Baer's last rendition of services was in October 1995, as it is undisputed that Baer sent a letter to Chase on February 10, 1997, critiquing Chase's early screenplay of The Sopranos. Indeed, this letter was already in the record at the time of the deposition. In addition, Baer corrected the "misstatement" in his deposition by reference to the "undisputed facts that were already in evidence" in his certification in opposition to Chase's motion for summary judgment.

Preliminarily on the statute of limitations issue we observe that under New Jersey law, non-personal injury actions involving monetary damages must be "commenced within 6 years after the cause of any such action shall have accrued." N.J. Stat. Ann. § 2A:14-1 (West 2000). Moreover, there is no dispute between the parties that the six-year statute of limitations governs quasi-contract claims. See Kopin v. Orange Prods., Inc., 688 A.2d 130, 140-41 (N.J. Super. Ct. App. Div. 1997). The initial issue here, however, is an inquiry into when the statute started to run.

Baer challenges the district court's holding that a quasi-contract claim "accrued, if at all" for the purposes of statue of limitations, when Baer rendered his final services in October 1995. Baer, 2004 WL 350050, at *9. Baer asserts that "the Court did not address Plaintiff's contention that the discovery rule should be applied and as a result the cause of action did not accrue until The Sopranos first aired on January 10, 1999." Appellant's br. at 58.

In New Jersey as elsewhere "[t]he discovery rule postpones the commencement of a cause of action until a Plaintiff knows, or should have known, of facts which establish that an injury has occurred, and that fault for that injury can be attributed to another." Riemer v. St. Claire's Riverside Med. Ctr., 691 A.2d 1384, 1388-89 (N.J. Super. Ct. App. Div. 1997) (citing Lynch v. Rubacky, 424 A.2d 1169, 1171 (N.J.

17

1981) ( "[The rule] provides that in an appropriate case a cause of action will be held not to accrue until the injured party discovers, or by the exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim . . . (or) knows or has reason to know that he has a right of redress.")).

Baer, however, does not cite any New Jersey decision applying the discovery rule to delay the time when the statute of limitations begins to run on a quasi-contract claim.[4] Moreover, while most jurisdictions have not ruled explicitly on whether the discovery rule should apply in quantum meruit cases, those that have addressed the issue have chosen not to utilize the discovery rule, but rather to employ a "last rendition of services" test. Thus, in Rabinowitz v. Mass. Bonding & Insurance Co., 197 A. 44, 47 (N.J. 1938), the court used a last "rendition of services" calculation in an unjust enrichment claim. Additionally, the court in Kopin, 688 A.2d at 140, cited a New York case granting summary judgment predicated on the statute of limitations in a quantum meruit case in which there was a failure of proof as to when the plaintiff completed his performance, Wint v. Fields, 576 N.Y.S.2d 266 (N.Y. App. Div. 1991). See also GSGSB, Inc. v. New York Yankees, 862 F. Supp. 1160, 1171 (S.D.N.Y. 1994) ("[A] cause of action for quantum meruit begins to run when the final

---

[4]The only case that Baer cites purporting to apply the discovery rule to a quasi-contract claim is a New York case, German v. Pope John Paul, 621 N.Y.S. 311 (N.Y. App. Div. 1995); see Appellant's br. at 59 ("[T]he Court expressly held that the discovery rule is applicable to quasi contract claims."). In German, the plaintiff brought an action against the Pope and others to recover on a tort claim and for breach of contract in connection with membership as a priest within a religious community. The trial court barred his claim, basing its statute of limitations determination on the erroneous conclusion that the plaintiff had resigned from the priesthood in January 1987. The appellate division noted that, in fact, the plaintiff became aware of the alleged improprieties within the religious community that gave rise to his causes of action for unjust enrichment in 1965 or 1966, some 27 years before he commenced the action and therefore held that the trial court properly dismissed the quasi-contract claim. To the extent that German is applicable to the discovery rule at all, it applied the rule to invalidate rather than sustain a quasi-contract claim. In the circumstances, German hardly provides us with a reason to predict that the New Jersey Supreme Court would apply the discovery rule to toll the accrual of a quasi-contract claim under New Jersey law.

18

service has been performed.") (citing <u>Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff</u>, 638 F. Supp. 714, 722 (S.D.N.Y. 1986)); <u>Martin v. Camp</u>, 114 N.E. 46 (N.Y. 1916); <u>County of Broome v. Board of Educ.</u>, 317 N.Y.S.2d 486, 489 (N.Y. Sup. Ct. 1971).

Baer's rationale in urging us to adopt the discovery rule for <u>quantum</u> <u>meruit</u> claims is doctrinally untenable as well. He alleges that "at the time Plaintiff's services were completed, Plaintiff reasonably believed that remuneration for those services was governed by a contractual agreement contingent upon the success of the show." Appellant's br. at 59. Baer therefore contends, "there is no possible way that Plaintiff knew or should have known that a cause of action had accrued until such time as <u>The Sopranos</u> aired on January 10, 1999." <u>Id.</u> He misunderstands the nature of a <u>quantum meruit</u> claim with respect to the statute of limitations. "In cases based on quasi-contract liability, the intention of the parties is entirely disregarded. . . ." <u>Callano v. Oakwood Park Homes Corp.</u>, 219 A.2d 332, 334 (N.J. Super. Ct. App. Div. 1966). In other words, Baer's belief that he was going to get paid if and when the show was a success is irrelevant because his understanding of his oral contract, even if correct, does not govern his quasi-contract claim inasmuch as a quasi-contract claim is not a "real" contract based on mutual consent and understanding of the parties. The essence of a quasi-contract claim is not the expectancy of the parties, but rather the unjust enrichment of one of them. It therefore would be inappropriate to look at Baer's expectations of payment, rather than at the services he provided Chase.

<u>Zic v. Italian Government Travel Office</u>, 149 F. Supp. 2d 473 (N.D. Ill. 2001), addressed the question of when a cause of action accrued and started the running of the clock on the statute of limitations in a <u>quantum meruit</u> suit. The plaintiff argued that his claim did not begin until the defendant failed to recognize accrued seniority or to make retroactive salary increases to which he claimed entitlement. <u>Id.</u> at 476. The district court stated that this argument "misunderstands the essence of a <u>quantum meruit</u> claim, which is not the plaintiff's expectancy of payment, but the unjust enrichment of the defendant." <u>Id.</u> The court held that the cause of action accrues upon presentment and subsequent rejection of a bill for services, or <u>as soon as the services were rendered</u>. <u>Id.</u> at 475-76.

It is clear that any application of the discovery rule would be inappropriate in analyzing whether the statute of limitations ran on Baer's <u>quantum meruit</u> claim. The district court was therefore correct

19

in utilizing a last rendition of services test to analyze whether Baer's claim was time barred.

The district court, utilizing the last services rendered test, held that the statute of limitations barred Baer's quasi-contract claim based on his deposition testimony that he last rendered services in October 1995. The district court disregarded Baer's later certification and the February 10, 1997 letter, holding:

> [I]n this case, the Plaintiff's deposition testimony regarding the date that performance was complete was a fact of crucial importance to his case, his performance and the February 10, 1997 letter were the subject of extensive questioning, and the Plaintiff had access to the relevant information at the time of his deposition.

Baer, 2004 WL 350050, at *9.

This disposition brings us to the second aspect of our statute of limitations discussion, the "sham affidavit" doctrine. In this regard we have held that a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict. Hackman v. Valley Fair, 932 F.2d 239, 241 (3d Cir. 1991). The "sham affidavit" doctrine refers to the trial courts' "practice of disregarding an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony." Shelcusky v. Garjulio, 797 A.2d 138, 144 (N.J. 2002). When a party does not explain the contradiction between the subsequent affidavit and the prior deposition, the alleged factual issue in dispute can be perceived as a "sham," thereby not creating an impediment to a grant of summary judgment based on the deposition. Id. Though the district court did not refer to the "sham affidavit" doctrine by name, it utilized its logic and cited precedent applying it in disregarding Baer's

20

certification.

The "sham affidavit" doctrine has its roots in the Court of Appeals for the Second Circuit's decision in Perma Research & Development Co. v. Singer Co., 410 F.2d 572, 577-78 (2d Cir. 1969). There the court, noting that the plaintiff was unable to justify an inconsistency between his deposition testimony and a later affidavit, disregarded the affidavit and determined that summary judgment should be granted against the plaintiff, explaining:

> If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

Id. at 578.

While many state and federal jurisdictions have incorporated the logic of Perma in assessing subsequently filed conflicting affidavits following a deposition, its application has not been applied without regard for the surrounding circumstances. 11 James Wm. Moore, et al., Moore's Federal Practice § 56.14[1][f] at 56-179 (3d ed. 1997) ("If a party's deposition and affidavit are in conflict, the affidavit is to be disregarded unless a legitimate reason can be given for discrepancies."). Thus, it is clear that merely because there is a discrepancy between deposition testimony and the deponent's later affidavit a district court is not required in all cases to disregard the affidavit. Kennett-Murray Corp. v. Bone, 622 F.2d 887, 894 (5th Cir. 1980); see Choudhry v. Jenkins, 559 F.2d 1085, 1090 (7th Cir. 1977) (summary judgment was improper even though party's testimony was "not a paradigm of cogency or persuasiveness," inasmuch it was not a "transparent sham").

In Kennett-Murray, 622 F.2d 887, the Court of Appeals for the Fifth Circuit declined to apply Perma and the "sham affidavit" doctrine in an action in which an employer sought recovery on a promissory note and employment contract from a former employee. Id. at 889. The central issue in dispute concerned "whether a genuine issue exist[ed] as to [a] question of fraud." Id. at 893. The district court granted the plaintiff's motion for summary judgment primarily relying on the defendant's deposition in which he testified that the plaintiff's vice president had not made any representations about the

21

note or the employment contract.  Id. at 892.   The court, because of inconsistencies with the earlier testimony, disregarded a subsequently filed affidavit supporting the defendant's allegations of fraud, which if, considered, would have raised a material issue of fact.  Id.

The court of appeals recognized that a court "cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier deposition" and that "a genuine issue can exist by virtue of a party's affidavit even if it conflicts with earlier testimony of the party's deposition."  Id. at 893.  In reversing the summary judgment order, it held that the subsequent affidavit was in fact not a "sham," as the defendant's affidavit did not claim to raise a new or distinct matter, but rather explained certain aspects of his deposition testimony that caused confusion.  Id. at 894.  The court additionally relied on the fact that the affidavit could not be said to constitute a reformulation of the defendant's general defense nor was it at odds with the general theory he put forth in the deposition.  Id. at 894-95.

In Martin v. Merrell Dow Pharmaceuticals, Inc., 851 F.2d 703 (3d Cir. 1998), the plaintiff was the mother of a child born with birth defects who made eight sworn factual statements tending to negate the defendant drug manufacturer's liability.  Later, facing an almost certain loss on summary judgment, she submitted a flatly contradictory affidavit which did not contain an explanation for her change in position.  We adopted the logic of Perma, and held that the district court properly could ignore the later affidavit.  We, however, did recognize that "there are situations in which sworn testimony can quite properly be corrected by a subsequent affidavit. . .[and] [w]here the witness was confused at the earlier deposition or for some other reason misspoke, the subsequent correcting or clarifying affidavit may be sufficient to create a material dispute of fact."  Id. at 705.

Baer argues that his deposition statement was "clearly, and understandably, mistaken," reasoning that "he was thinking in terms of the overwhelming majority of his services."  Appellant's br. at 62.  The district court refused to accept Baer's "mistake" argument, relying on the fact that the matter that was of critical importance to his claim and the subject of repeated questioning.  Baer, 2004 WL 350050, at *9.

If Baer had advanced only the argument that he had made a mistake, exclusion of the later certification might have been appropriate.  The district court, however, overlooked the importance of the evidence existing in the record, i.e., the February 10, 1997 letter

22

that buttressed Baer's subsequent certification. We therefore must address the question of whether corroborating evidence as to the substance of a later certification ameliorates the concerns that gave rise to the "sham affidavit" doctrine, thereby allowing a subsequent competing affidavit to create a dispute as to a genuine issue of a material fact.

When there is independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit. See Bushell v. Wackenhut Int'l, Inc., 731 F. Supp. 1574, 1578 (S.D. Fla. 1990) (third party's deposition testimony can lend credence to subsequent affidavit). The Court of Appeals for the Second Circuit has held the introduction of evidence can help rebut a charge of a "sham" affidavit. Thus, in Palazzo ex rel. Delmage v. Corio, 232 F.3d 38, 43-44 (2d Cir. 2000), the same court that had decided Perma recognized that "a party's deposition testimony as to a given fact does not foreclose a trial or an evidentiary hearing where that testimony is contradicted by evidence other than the deponent's subsequent affidavit, for when such other evidence is available, the concern that the proffered issue of fact is a mere 'sham' is alleviated." The court held that the district court properly allowed a party to introduce documentary evidence to support his residency claims contrary to his deposition. The Court of Appeals for the Tenth Circuit reached a similar conclusion in Delany v. Deere & Co., 219 F.3d 1195, 1996 n.1 (10th Cir. 2000), in which it stated that, "[w]hile a party may not defeat summary judgment by contradicting deposition testimony in a subsequent affidavit, new evidence may furnish a good faith basis for the inconsistency."

Baer's ability to point to evidence in the record that corroborates his later affidavit alleviates the concern that he merely filed an erroneous certification out of desperation to avoid summary judgment. Moreover, Chase does not deny receiving the letter and his personal assistant told Baer that Chase, in fact, had received the letter. And finally, Chase himself has provided the letter in discovery. Given this evidence which corroborates the certification, the concern that Baer's claim that he performed services as late as February 10, 1997, is either desperate or erroneous is eliminated, and therefore the court should have analyzed the letter and the circumstances surrounding it and Baer's certification when ruling on the summary

23

judgment motion on the statute of limitations issue.[5] The district court therefore erred, at least procedurally, in granting Chase's summary judgment motion based on the statute of limitations with respect to Baer's quantum meruit claim. We therefore will reverse the summary judgment on this point and will remand the question of whether Baer presented a timely and otherwise valid quasi-contract

[5]Chase argues that even if we refuse to disregard the February 10, 1997 letter, "the letter cannot be characterized as a compensable 'service' as a matter of law." Appellees' br. at 42. Chase contends that we should disregard the February letter on two grounds, the first of which is its timing. Chase did not receive the letter until some 14 months after he mailed the screenplay to Baer, as well as after all the major networks had rejected the draft. Chase argues that even if the letter had value at one time, it had no value to him when he actually received it. Second, Chase argues that the letter had no value to him as it contained only cursory observations and laudatory phrases about his work. Chase premises his argument on the assumption that in analyzing the statute of limitations for quantum meruit purposes we should dissect the last service rendered to deem if it provided value to the opposing party.

We will not affirm the summary judgment on this basis. First, Baer's letter describes the aspects of the screenplay that he believes were successful, the parts to which he related personally, and what humor worked, and provided encouragement to continue with the project. App. at 22. We will not write these contributions off, as Chase attempts to do, as "empty flattery."

Additionally, we will not dissect each interaction between litigants to quantify the precise value of each correspondence or service rendered. The exchange of ideas and services should not be viewed as incremental, segregable interactions that we can assess individually for purposes of the statute of limitations. A separate issue would arise if a litigant sent a correspondence or rendered a "sham service" in an attempt to avoid the statute. That situation, however, does not describe the circumstances before us. We will not engage in Chase's request to judge whether the February letter, taken in isolation, was a "compensable service." We are satisfied that Baer sent the letter and Chase received it, and thus at least at this time it will serve as the "last service rendered" for purposes of the statute of limitations calculus.

claim to the district court for further consideration.[6]

## C.  Baer's Misappropriation Claim

Baer next raises the issue of whether the district court erred in holding that the fact that the ideas he advanced existed in the public domain precluded those ideas, alone or in combination, from possessing the requisite novelty so that their use cannot be the basis for a claim for common law idea misappropriation.  The cause of action of "misappropriation" is based on tort principles rather than on contract law.  Restatement (Third) of Unfair Competition § 40, cmt. a.  The premise behind the tort is that when a party misappropriates another's confidential idea or some other type of property, the law imposes an obligation on that party to pay the other restitution for its improper use.  Id.; Duffy, 124 F. Supp. 2d at 808.

There is no dispute between the parties that this case is governed by the leading precedent on the misappropriation of ideas in New Jersey, Flemming v. Ronson Corp., 258 A.2d 153, 156-57 (N.J. Super. Ct. Law Div. 1969), aff'd, 275 A.2d 759 (N.J. Super. Ct. App. Div. 1971); see also Ahlert v. Hasbro, Inc., 325 F. Supp. 2d 509, 513 n.6 (D.N.J. 2004) (citing Flemming test in misappropriation claim); Johnson v. Benjamin Moore & Co., 788 A.2d 906, 914 (N.J. Super. Ct. App. Div. 2002) (same);   The court in Flemming articulated the

_____

[6]We do not consider whether Baer was entitled to summary judgment with respect to the timeliness of his quasi-contract claim.  In this regard we point out that Baer did not move for summary judgment in the district court.  While it is not unusual for us when reversing a summary judgment for one party to direct that the district court grant summary judgment to the other party, ordinarily, at least, we do this in circumstances in which the parties made cross-motions for summary judgment in the district court.  See, e.g., Nazay v. Miller, 949 F.3d 1323, 1327-28 (3d Cir. 1991); First Nat'l Bank v. Lincoln Nat'l Life Ins. Co., 824 F.2d 277, 281-82 (3d Cir. 1987).  Accordingly, we go no further with respect to the statute of limitations issue than to hold that the district court should not have disregarded Baer's certification and it should have considered the February 10, 1997 letter.  Therefore our analysis in supra note 5, will not preclude the district court on a fuller examination of the facts from coming to a conclusion contrary to ours as we write on the point merely for the limited purpose of addressing Chase's argument that we should affirm the summary judgment on a different basis than that of the district court.

test for determining whether the law will imply an obligation to pay for a confidentially submitted idea: When "a person communicates a novel idea to another with the intention that the latter may use the idea and compensate him for such use, the other party is liable for such use and must pay compensation if . . . (1) the idea was novel; (2) it was made in confidence [to the defendant]; and (3) it was adopted and made use of [by the defendant in connection with his own activities]." Flemming, 258 A.2d at 156-57 (citing Mitchell Novelty Co. v. United Mfg. Co., 199 F.2d 462 (7th Cir. 1952); De Filippis v. Chrysler Corp., 53 F. Supp. 977 (S.D.N.Y. 1944), aff'd, 159 F.2d 478 (2d Cir. 1947); Official Airlines Schedule Info. Serv., Inc. v. Eastern Air Lines, Inc., 333 F.2d 672 (5th Cir. 1964)).

Thus, the misappropriation issue on appeal is whether the ideas Baer provided were novel. While novelty is clearly a prerequisite to establish a misappropriation claim in New Jersey, Johnson, 788 A.2d at 914-15, the courts have not articulated clearly the test for determining whether an idea is sufficiently novel to warrant protection. See Duffy, 123 F. Supp. 2d at 808. Two leading cases dealing with the parameters of New Jersey misappropriation law arose in federal courts deciding state law issues, Duffy, 123 F. Supp. 2d 802, and Bergin v. Century 21 Real Estate Corp., No. 98 Civ. 8075, 2000 WL 223833 (S.D.N.Y. Feb. 25, 2000), aff'd, 234 F.3d 1261 (2d Cir. 2000) (table).

As the district court noted in Duffy, it is unclear whether the issue of novelty is "an issue of fact, for the fact finder, a question of law, for the jury or a mixed question of fact and law." Duffy, 123 F. Supp. 2d at 808. The Flemming opinion followed a bench trial so such a determination was unnecessary. Flemming, 788 A.2d at 154. The district court in Bergin, though deciding the case under New Jersey law, looked to New York law and held that "[w]hether an idea is novel is an issue of law which may be decided on a motion for summary judgment." Bergin, 2000 WL 223833, at *9. The Duffy court held that the "New Jersey Supreme Court would determine that although some of the factors relevant to a determination of novelty may be factual, the ultimate determination of whether an idea is novel is a question of law for the court." 123 F. Supp. 2d at 809. Duffy relied on the similarities to a court's role with respect to "obviousness" in patent cases, citing Ryko Mfg. Co. v. Nu-Star, Inc., 950 F.2d 714, 716 (Fed. Cir. 1991), and cases holding that the "novelty" determination is a matter of law. See Duffy, 123 F. Supp. 2d at 809 (citing extensive list of cases that hold that the determination of novelty is a question of law). Additionally, Duffy

26

indicated that "even courts holding that the question is a factual one have not hesitated to grant summary judgment on the basis of lack of novelty when the underlying facts do not support a finding of novelty." Id. (citing Wilson v. Barton & Ludwig, Inc., 296 S.E.2d 74, 78 (Ga. Ct. App. 1982)).   We believe that the district court here was correct in its conclusion as to how the New Jersey Supreme Court would decide this issue and it is therefore necessary to determine the "novelty" of Baer's contribution.

The predicates on which a property right in an idea may be based are novelty and originality.  See Downey v. General Foods Corp., 286 N.E.2d 257, 259 (N.Y. 1974).  A misappropriation claim, unlike a contract-based claim, only can arise from the taking of an idea that is original or novel because the law of property does not protect against the appropriation of that which is free and available to all.  Nadel, 208 F.3d at 378.   Therefore, anyone may use ideas in the public domain freely with impunity.  See Ed Graham Prods., Inc. v. National Broad. Co., 347 N.Y.S.2d 766 (N.Y. Sup. Ct. 1973).

The district court here acknowledged Duffy's observation that the law of  "unfair competition 'is an amorphous area of jurisprudence' and 'knows of no clear boundaries.'" Baer, 2004 WL 350050, at *12 (citing Duffy, 123 F. Supp. 2d at 815).  For example, the court in Duffy noted that the Flemming court, "did not discuss a specific test that should be used to determine whether an idea is novel." Duffy, 123 F. Supp. 2d at 809.

The present facts, however, do not compel us to set forth a broad description of what is novel in our disposition of Baer's misappropriation claim.  Though Flemming did not articulate a test for affirmatively determining when an idea is "novel," the court did cite examples of ideas that would not be novel.  The Flemming court recognized that even an otherwise novel idea would lose its novelty if it was "in the domain of public knowledge" before the defendant used it.  Flemming, 258 A.2d at 157-58.  The Duffy court expanded on this conclusion by noting "[a]n idea will not satisfy [the novelty requirement] if it is not significantly different from, or is an obvious adaptation or combination of ideas in the public domain." Duffy, 123 F. Supp. 2d at 810.  The Court of Appeals for the Second Circuit, applying New Jersey law, also noted in Bergin v. Century 21 Real Estate Corp., 234 F.3d 1261 (2d Cir. 2000) (table), available at 2000 WL 1678777, at *3, that "[s]ummary judgment is appropriate where the defendant knew of the idea or the idea was 'a matter[] in the domain of public knowledge before the plaintiff disclosed it to the

27

defendant.'" Other jurisdictions have taken like positions. See Educational Sales Programs, Inc. v. Dreyfus Corp., 317 N.Y.S.2d 840, 844 (N.Y. Sup. Ct. 1970) ("The idea need not reflect the 'flash of genius,' but it must shown genuine novelty and invention, and not a merely clever or useful adaptation of existing knowledge."); Oasis Music, Inc. v. 900 U.S.A., Inc., 614 N.Y.S. 2d 878, 882-84 (N.Y. Sup. Ct. 1994) (declining to attribute novelty where ideas were variations and adaptations of existing knowledge in the public domain). We conclude, similarly, that the New Jersey Supreme Court, if addressed with the issue, would hold that ideas lose their novelty if they are in the domain of public knowledge before use. Such ideas cannot be misappropriated.

Baer admits that all of the locations he identified to Chase exist in the public domain.[7] In addition, many of the stories and potential plot lines that Baer "provided" Chase existed in the public record.[8] Moreover, as the district court noted, the additional ideas and stories that Baer claims were misappropriated were not his stories; "associates" of Baer actually told them to Chase:

> In particular, the Plaintiff seeks compensation for Spirito's story of rivalry with his uncles in the aftermath of his father's death, that Koczur's account to Chase that many waste management companies were alleged to be involved with organized crime, Spirito's story of his experiences with a 'loan shark' and Jones's description of the way in which organized crime uses loan shark debts to take over a business,

_____

[7]Baer "introduced" Chase to the City of Elizabeth, The Pulaski Skyway, and Centanni's Meat Market.

[8]For example, Baer relayed the following stories to Chase: the RCA and Morris Levy "scam," which was the subject of a published book; information regarding the DeCavalcante family and organized crime which existed in public lure of New Jersey; and wire taps that were part of the public record having been played at a criminal trial. We note that Morris Levy, an individual Jones discussed, and who is a prominent figure in the parties' briefs, is not unknown to this court. See United States v. Vastola, 915 F.2d 865, 868 (3d Cir. 1990).

28

> Jones's description of the operation of 'cutout' schemes used by organized crime, Koczur's information regarding the involvement of the DeCavalcante crime family in Saint Anthony's Church in Elizabeth, and a story told to Chase by Jones about Morris Levy's horse farm.

Baer, 2004 WL 350050, at *13 (emphasis added).  It is clear that virtually all of Baer's alleged contributions either existed in the public domain or concerned stories and facts he did not provide.

Baer argues that he did not simply introduce these third-parties to Chase, but rather "the majority of ideas were suggested by Plaintiff prior to the meeting." Appellant's br. at 67.  Baer alleges that his aggregating and combining of ideas was essential in "put[ting] it all together" and "creat[ing] the 'template' for The Sopranos." Appellant's br. at 66.  Baer alleges that it is "their combination that gives these ideas originality."  Id. at 68.  In other words, Baer's contribution in essence was "choosing" which ideas, existing in the public domain, he would present to Chase.

Aggregation of ideas and expression do not by themselves create novelty.  In Duffy the plaintiff argued that "its idea was novel because [it] spent many months deciding the organization and layout of the data so its products could be readily understood by nonprofessional investors. . . .  [It] stated that it was the format that made Duffy's reports unique and proprietary to [it]."  123 F. Supp. 2d at 812.  The plaintiff in Duffy took data, fields and information in the public domain and organized them to create a "mutual fund report card."  Id.  The court held that, though the organization and layout of the data may involve some originality, this articulation of originality went more to an idea's expression than to the idea itself.  Id.  It is well-established that an idea's expression is not entitled to protection under a state's misappropriation law.  Id.  As the court in Duffy recognized, "To the extent a state's law purports to impose liability for the misappropriation of an idea's expression, such a law would be preempted by federal copyright law." Duffy, 123 F. Supp. 2d at 812 n.5 (citing 17 U.S.C. § 106; Wilson v. Mr. Tee's, 855 F. Supp. 679, 684-85 (D.N.J. 1994); Rowe v. Golden W. Television Prods., 445 A.2d 1165 (N.J. Super. Ct. App. Div. 1982)).  Despite Baer's creativity in combining stories and facts existing in the public domain, New Jersey does not protect this mode of originality under its

29

misappropriation law.  Thus, the district court correctly granted Chase summary judgment on Baer's misappropriation claim.

## D.  District Court's Exclusion of Expert Report

The final issue raised on appeal is whether the district court abused its discretion by excluding Baer's expert report from consideration on issues of liability.  Early in the litigation, the court bifurcated the case into liability and damage phases, with expert discovery not being contemplated or authorized by any scheduling order.  Baer's attorney later retained John Agoglia as an "expert witness" regarding "the damages aspect of case" to be used by Baer "should [Defendant] raise an issue regarding the calculation of damages at summary judgment."  App. at 902, 914.

Faced with the summary judgment motion, Baer attempted to include Agoglia's report which stated "a contribution of such ideas and services [as those made by Baer] toward the creation of a television series such as The Sopranos . . . would commonly be rewarded with fixed payments and/or production bonuses and or a sliding scale of profit participation and/or screen credits in recognition of such contributions, or any combination thereof." App. at 27.  The district court excluded Agoglia's report based on the fact that he was not presented as a liability expert and that his report did not opine on liability.  App. at 175.

The district court did not abuse its discretion by disregarding the report with respect to a summary judgment motion focusing solely on issues of liability.  Agoglia was not presented as an expert on liability. We agree with the court's assessment that,  "I don't see how somebody who was put forth under Rule 26 as a damages expert is going to be able to bootstrap liability issues into a summary judgment motion."  App. at 196.  The damage expert's testimony had no relevance to the questions of formation or enforceability of the purported contract.  Chase named Agoglia to be an expert witness on damages; his opinions with respect to liability are simply beside the point.

Baer's brief allocates little space in presenting an argument as to how the court erred in excluding the damages report from the liability phase of the trial.  Bear clearly presented Agoglia as a damages expert to the district court and his adversary.  The court did not err in refusing Baer's attempts to "bootstrap" a damages witness who repeatedly agreed that he had no legal training to testify as an

expert on liability.


## IV. CONCLUSION

Inasmuch as the district court erroneously disregarded Baer's certification, which, if considered, might have precluded the grant of summary judgment on the quantum meruit claim on a statute of limitations basis, we will reverse the order of the district court entered February 20, 2004, and remand the case for further proceedings in the district court solely on that claim. Otherwise we will affirm the order of February 20, 2004. The parties will bear their own costs in this appeal.

———